**Clive Michael BOUTILIER, Petitioner,**

v.

**The IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 429, Docket 30274.**

United States Court of Appeals
Second Circuit.

Argued June 2, 1966.

Decided July 8, 1966.

Moore, Circuit Judge, dissented.

Blanch Freedman, New York City (David M. Freedman, New York City, on the brief), for petitioner.

Francis J. Lyons, Sp. Asst. U. S. Atty. (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, James G. Greilsheimer, Sp. Asst. U. S. Atty., on the brief), for respondent.

Before MOORE, SMITH and KAUF-MAN, Circuit Judges.

KAUFMAN, Circuit Judge:

Although a relatively young segment of contemporary society prides itself on its readiness to cast off conventional and tested disciplines and to experiment with nonconformance and the unorthodox merely to act out its contempt for traditional values, certain areas of conduct continue to be as controversial in modern and *beau monde* circles as they were in

bygone and more staid eras. Homosexual behavior, despite Sigmund Freud [1] and other noted authors,[2] remains such a fervently debated issue that too often emotions on both sides obscure reason. But, the craft of judging requires a personal detachment—as far as it is humanly possible—so that issues which are apt to overwhelm the emotions may be approached in the dispassionate manner fitting for a judicial determination. See Learned Hand, "Fifty Years of Federal Judicial Service," published in Handbook for Judges (1961). Our function in this case, therefore, is not to approve or disapprove of the conduct we are examining; nor is it necessary for us to determine the mores of the community. Rather, our duty is simply to interpret a statute and to make the traditional determination as to its application.

## I.

Clive Michael Boutilier petitions for review of a final order of the Board of Immigration Appeals directing his deportation to Canada as one who upon entry into this country was a homosexual and, thus, was afflicted with a "psychopathic personality" within the meaning of section 212(a) (4) of the Immigration and Naturalization Act of 1952 (Act), 8 U.S.C. (1964 ed.) § 1182(a) (4).[3] For the reasons set forth below, we uphold the order of the Board and dismiss the petition for review.

The basic facts, which were not seriously disputed, lend themselves to simple statement. Boutilier, a native and citizen of Canada, was admitted into the United States for permanent residence on June 22, 1955 at the age of 21. Since that time, with the exception of short trips outside the country, he has continuously resided here and has been gainfully employed as a building maintenance man, most recently by a large company in Manhattan. Boutilier's mother and stepfather also live in New York and three of his five brothers and sisters reside in the United States.

In September 1963, as part of Boutilier's application to file a petition for citizenship, he submitted an affidavit to a naturalization examiner forthrightly admitting that he had been arrested in October 1959 on a charge of sodomy, in violation of New York Penal Law, McKinney's Consol.Laws, c. 40, § 690. Boutilier noted that he had been discharged on his own recognizance and that the charge was reduced to simple assault and ultimately dismissed when the complaining party failed to appear in court. Boutilier freely acknowledged that the circumstances leading to the arrest involved acts of anal sodomy and fellatio with a minor—a 17-year-old male.

This affidavit was forwarded to the Immigration Service and, in January 1964, an Immigration Officer informed Boutilier that the government desired additional information. Submitting another sworn statement, Boutilier revealed the full history of his sexual deviate behavior. He stated that his first homosexual experience occurred in Canada when he was approximately 14 years of age; the act was involuntary and Boutilier played a passive role. However, from the time he was 16 until he came to the United States 5 years later, Boutilier voluntarily engaged in homosexual activity on an average of 3 or 4 times a

---

1. "Homosexuality is assuredly no advantage, but it is nothing to be ashamed of, no vice, no degradation, it cannot be classified as an illness; we consider it to be a variation of the sexual function produced by a certain arrest of sexual development." Freud, "Letter to an American Mother," published in 107 Am. Jour.Psych., 786–787 (1951).

2. Kinsey, Sexual Behavior in the Human Male, 623 (1948).

3. Section 212(a) provides in pertinent part:

 Except as otherwise provided in this Act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

 \* \* \* \* \*

 (4) Aliens afflicted with psychopathic personality, epilepsy, or a mental defect; \* \* \*.

year.[4] These experiences all involved fellatio and Boutilier was generally the active participant. After Boutilier entered this country in 1955, his homosexual conduct continued with approximately the same frequency. Indeed, Boutilier shared an apartment with a male with whom he had sexual relations and, as the result of Boutilier's admitted homosexual condition and a Selective Service psychiatric examination, he was classified 4-F by the Selective Service System.

Immigration officials dispatched this second and more complete statement to the United States Public Health Service for its expert views as to whether there were grounds for concluding that Boutilier was excludable from the United States when he entered in 1955. After reviewing this document, the Public Health Service issued a certificate stating that, on the basis of the information furnished, it was of the opinion that Boutilier "was afflicted with a class A condition, namely, psychopathic personality, sexual deviate, at the time of his admission to the United States for permanent residence on June 22nd, 1955." [5]

Armed with this certificate and the supporting documents, the government commenced deportation proceedings. At hearings held before a Special Inquiry Officer, Boutilier declined an opportunity for an *in personam* examination by Public Health Service doctors. He did, however, introduce two letters[6] from privately retained psychiatrists which were received in evidence without objection by the government.[7] In addition, it was substantially agreed between the parties that this additional material would not cause the Public Health Service to change its certification and, accordingly, no purpose would be served by calling a Public Health Service doctor to testify. Based on the evidence and stipulations, the Special Inquiry Officer concluded that Boutilier had been a homosexual at the time of entering the United States and, thus, was excludable as one afflicted with a "psychopathic personality." On this basis, the Special Inquiry Officer ordered Boutilier deported, noting that the phrase "psychopathic personality" as used in section 212(a) (4) of the Act is not a medical formulation but is a legal term of art evincing a Congressional purpose to exclude from this country any alien who is shown to be a homosexual. After an unsuccessful appeal to the Board of Im-

4. Boutilier acknowledged that, occasionally, he also engaged in hetero-sexual conduct.

5. The certificate was signed by Paul G. Smith, M.D., Senior Surgeon, United States Public Health Service, Chief of Psychiatry and by Maria Sarrigiannis, M.D., Medical Director, United States Public Health Service.

6. One letter was signed by Edward F. Falsey, M.D. and dated March 2, 1964. It stated:

> On psychiatric examination of Mr. Boutelier [*sic*], there was no indication of delusional trend or hallucinatory phenomena. He is not psychotic. From his own account, he has a psychosexual problem but is beginning treatment for this disorder. Diagnostically, I would consider him as having a Character Neurosis, believe that the prognosis in therapy is reasonably good and do not think he represents any risk of decompensation into a dependent

psychotic reaction nor any potential for frank criminal activity.

The second letter was in the form of a "Clinical Abstract" on the stationery of Montague Ullman, M.D., under date of March 30, 1965. In pertinent part, it stated:

> [Boutilier's] sexual structure still appears fluid and immature so that he moves from homosexual to heterosexual interest as well as abstinence with almost equal facility. His homosexual orientation seems secondary to a very constricted, dependent personality pattern rather than occurring in the context of a psychopathic personality. My own feeling is that his own need to fit in and be accepted is so great that it far surpasses his need for sex in any form.

7. The government noted, however, that it considered the phrase "psychopathic personality" appearing in Dr. Ullman's letter to be used in a medical frame of reference and not as a legal term of art.

migration Appeals, Boutilier asks us to vacate the order of deportation.

## II.

Boutilier now urges that an actual medical examination by the Public Health Service was an indispensable prerequisite to its opinion that he was afflicted with a "psychopathic personality."[8] In support of this position, Boutilier relies on section 234 of the Act, 8 U.S.C. § 1224, which directs that certification of the physical and mental condition of "arriving aliens * * * shall be made by medical officers of the United States Public Health Service, who shall conduct all medical examinations and shall certify, for the information of the immigration officers and the special inquiry officers, any physical and mental defect or disease observed * * *." See also 42 C.F.R. § 34.1. Boutilier urges that if an exclusion proceeding is to be valid, adherence to these procedures is required. See United States ex rel. Johnson v. Shaughnessy, 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054 (1949).

While this contention possesses surface plausibility, it is spurious and has a fatal flaw: it glosses over the basic and fundamental distinction between exclusion and deportation proceedings. Boutilier's ouster was directed because he was "excludable" in 1955 as one afflicted with a "psychopathic personality." But, this is not to say that the process by which his expulsion was ordered was an exclusion proceeding. On the contrary, section 241 (a) of the Act, 8 U.S.C. (1964 ed.) § 1251 (a), expressly provides that "[a]ny alien in the United States * * * shall * * * *be deported* who * * * at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry * * *" (emphasis added).

■ Thus, section 234 and the cases and regulations which Boutilier cites are not in point; they describe requirements which are applicable solely to exclusion proceedings and have nothing to do with deportation procedures—our main concern here and the path to be followed is laid down in section 242(b) of the Act, 8 U.S.C. § 1252(b). We note, in this connection, that Boutilier does not claim that the government failed to comply with the rules and regulations which guide the conduct of deportation proceedings.

■ The confusion between "exclusion" and "deportation" is also at the root of Boutilier's argument that he is being expelled on a non-statutory ground. Boutilier asserts that while affliction with a "psychopathic personality" may furnish a basis for exclusion, this term does not authorize deportation. We find no merit in this suggestion. Section 241, as we have noted, authorizes the deportation of any alien who could have been excluded upon entering the United States. While this form of "delayed exclusion" has not been altogether free from criticism, see Note, Limitations on Congressional Power to Deport Resident Aliens Excludable as Psychopaths at Time of Entry, 68 Yale L.Jour. 931, 935 (1959), without the provision, an imprimatur would be placed on deception of immigration officials at time of entry. Developments in the Law: Immigration and Nationality, 66 Harv.L.Rev. 643, 682 (1953). The function served by deportation in cases where the petitioner was excludable is to furnish a backstop or check designed to intercept those whom Congress believed should not have been admitted into the United States in the first instance.

## III.

■ Despite Boutilier's arguments to the contrary, we believe the term "psychopathic personality" as employed in section 212(a) (4) reflects a Congressional purpose to prevent alien homo-

---

8. It could be urged that Boutilier is estopped from making this contention in view of his rejection of the government's offer to have the Public Health Service conduct an *in personam* examination.

But, in view of the serious consequences of a deportation order and the government's failure to press this point, we shall make our determination on the merits.

sexuals from obtaining admission into this country. It was employed as a term of art to be interpreted by what Congress intended as a guide, and not to be left to the vagaries and honest but conflicting theories of psychiatry for determination.[9] The legislative history of the Act of 1952 and of the various bills and resolutions which gave rise to it leaves no room for doubt that Congress intended to exclude homosexuals and would have expressly so provided if the Public Health Service had not advised that the term "psychopathic personality" alone was sufficient to accomplish this result.

Prior to 1952, the Immigration laws employed the language "persons of constitutional psychopathic inferiority," as those subject to exclusion, section 3 of the Act of February 5, 1917, 39 Stat. 875; but, the 1952 Act changed this terminology to the more modern concept of "psychopathic personality." Initially, the Senate Committee on the Judiciary reported that "the purpose of the provision against 'persons with constitutional psychopathic inferiority' will be more adequately served by changing that term to 'persons afflicted with psychopathic personality,' and that the classes of mental defectives should be enlarged to include homosexuals and other sex perverts." S.Rep.No.1515, 81st Cong., 2d Sess., 345 (1950).

As a result, a series of proposed bills were drafted, each of which provided for the exclusion of "aliens afflicted with psychopathic personality" and "aliens who are homosexuals or sex perverts." See, e. g., S. 3455, 81st Cong., 2d Sess., § 212(a) (1950); S. 716, 82d Cong., 1st Sess., § 212(a) (1951). In S. 2550, 82d Cong., 2d Sess., § 212 (1952), however, express reference to "aliens who are

homosexuals or sex perverts" was eliminated for the following reason:

Existing law does not specifically provide for the exclusion of homosexuals and sex perverts. The provisions of S. 716 which specifically excluded homosexuals and sex perverts as a separate excludable class does not appear in the instant bill. The Public Health Service has advised that the provision for the exclusion of aliens afflicted with psychopathic personality or a mental defect which appears in the instant bill is sufficiently broad to provide for the exclusion of homosexuals and sex perverts. *This change of nomenclature is not to be construed in any way as modifying the intent to exclude all aliens who are sexual deviates.* S.Rep.No.1137, 82d Cong., 2d Sess., 9 (1952) (emphasis added).

While S. 2550 was not enacted, the report accompanying H.R. 5678, the bill which ultimately became the Act of 1952, contained similar reference to observations by the Public Health Service. Commenting on the medical aspects of a predecessor bill (H.R. 2379, 82d Cong., 1st Sess., § 212(a) (1951)), which had placed "homosexuals or sex perverts" in a separate excludable category, the Public Health Service recommended that this separate rubric be eliminated and that the phrase "psychopathic personality"— the terminology ultimately enacted—be employed. The Service noted that this phraseology would satisfy the Congressional objective of excluding homosexuals and perverts because ordinarily sexual deviation was a manifestation of a psychopathic personality. In reporting out the bill, which was to become the 1952 Act, the House Judiciary Committee indicated that, with an exception not here relevant, it had accepted the Public

9. It is also interesting that some psychiatrists have recently used the term "sociopath" in lieu of "psychopathic personality." See Hinsie & Campbell, Psychiatric Dictionary, 600, 682 (Third Ed. 1960). And, psychiatrists, at times, have changed their minds, as to whether "psychopathic personality" constitutes a "mental disease or defect" for purposes of determining criminal responsibility. See Blocker v. United States, 110 U.S. App.D.C. 41, 288 F.2d 853, 860 (1961), Burger, J. (concurring).

Health Service's recommendations. H.R. Rep.No.1365, 82d Cong., 2d Sess., 46–48 (1952).

Thus, on the basis of this brief survey of the legislative history of section 212 (a) (4), it seems fairly clear that Congress utilized the phrase "psychopathic personality" not as a medical or psychiatric formulation but as a legal term of art designed to preclude the admission of homosexual aliens into the United States. "[W]hatever the phrase 'psychopathic personality' may mean to the psychiatrist, to the Congress it was intended to include homosexuals and sex perverts. It is that intent which controls here." Quiroz v. Neelly, 291 F.2d 906, 907 (5th Cir. 1961). See also, Ganduxe y Marino v. Murff, 183 F.Supp. 565 (S.D.N.Y.1959), affirmed without opinion sub nom. Ganduxe y Marino v. Esperdy, 278 F.2d 330 (2d Cir.), cert. denied, 364 U.S. 824, 81 S.Ct. 61, 5 L.Ed. 2d 53 (1960); United States v. Flores-Rodriguez, 237 F.2d 405, 412–413, n. 2 (2d Cir. 1954) (concurring opinion).[10]

■■ Our review of the legislative history of section 212(a) (4) also disposes of Boutilier's contention that the Public Health Service exceeded its statutory authority by classifying all homosexuals as persons "afflicted with psychopathic personality." Paragraph 6–b of the United States Public Health Serv-

ice Manual provides that in the category of psychopathic personality "will be classified those applicants who are diagnosed as sexual deviates." While some psychiatrists believe that all homosexuals cannot properly be termed psychopaths,[11] Paragraph 6–b also notes that the phrase "psychopathic personality" is a "legal" term. Moreover, as we have observed, since Congress intended to exclude homosexual aliens, the Public Health Service cannot be faulted for implementing this statutory purpose by utilizing an automatic rule which functions in such a way as to accomplish this objective.[12]

IV.

Placing principal reliance on Fleuti v. Rosenberg, 302 F.2d 652 (9th Cir. 1962), remanded on other grounds, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), Boutilier vigorously maintains that section 212(a) (4) is void for vagueness and that the order directing his deportation deprived him of due process. The Court of Appeals for the Ninth Circuit has found this argument persuasive and, citing Fleuti, has recently adhered to this view in a *per curiam* opinion, Lavoie v. United States Immigration and Naturalization Service, 360 F.2d 27 (9th Cir. 1966). At the heart of Boutilier's argument is the notion that the term "psychopathic personality" lacked sufficient precision to convey adequate warning to him

10. Indeed, because of contrary interpretations in the Ninth Circuit, discussed in section IV of this opinion, *infra*, Congress recently amended section 212(a) (4) to provide expressly what its reports have said over and over again—that "sexual deviates" are excludable. Section 15(b) of the Act of October 3, 1965, 79 Stat. 919. The committee reports of both houses state:

To resolve any doubt the Committee has specifically included the term "sexual deviation" as a ground of exclusion in this bill. H.R.Rep. No. 745, 89th Cong., 1st Sess., 16 (1965). S. Rep. No. 748, 89th Cong., 1st Sess., 19 (1965).

11. See e. g. n. 6, supra.

Dr. Paul G. Smith who signed the certification of Boutilier's condition as a "psychopathic personality" testified that

modern psychiatric theory does not espouse the proposition that a sexual deviate is *ipso facto* a constitutional psychopathic inferior or a psychopathic personality. Matter of Anne-Lise Coppo, a deportation proceeding, file No. A–6845593—New York (December 8, 1965).

But, as we have noted, in the context of this case, psychiatric definitions are not determinative of the legal purport of the term "psychopathic personality."

12. We also reject Boutilier's contention that there was insufficient evidence of his "psychopathic personality at the time of his entry into the United States to justify deportation. Boutilier's sworn statement describing in detail his homosexual activities in Canada provided more than ample proof of his excludable condition.

that post-entry homosexual conduct was proscribed. Upon examining the rationale of the void-for-vagueness doctrine, however, we conclude that it is inapplicable to section 212(a) (4).

 Although it is a legal fiction that everyone is presumed to know the law, that precept does not always come to the aid of the prosecutor nor work against the transgressor. A corollary of this doctrine is that legislation must be sufficiently precise to afford adequate notice of the standards by which the individuals affected are required to guide themselves. "The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954). While the void-for-vagueness doctrine is principally employed in the interpretation and application of criminal statutes, it is also relevant in considering legislation imposing civil sanctions. Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); [13] Small Co. v. American Sugar Refining Co., 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589 (1925); Miller v. Strahl, 239 U.S. 426, 36 S.Ct. 147, 60 L.Ed. 364 (1915); see generally, Note, Due Process Requirements of Definiteness in Statutes, 62 Harv.L.Rev. 77 (1948).

We do not quarrel with Boutilier's contention that the term "psychopathic personality" is not a model of clarity. There is no denial that Congress sought assurance that the phrase would encompass homosexuals and sex perverts.[14] And, while the Public Health Service counseled that "psychopathic personality" was sufficiently broad to fulfill the Congressional objective of excluding sexual deviates, the Service candidly advised that, in terms of medical reference, the definition was "vague and indefinite," and that

"no more appropriate expression can be suggested at this time." H.R.Rep.No. 1365, 82d Cong., 2d Sess., 46–47 U.S. Code Congressional and Administrative News, p. 1700 (1952).

 But all this does not establish that section 212(a) (4) is defective under the void-for-vagueness doctrine. The provision was never designed to regulate *conduct*; its function was to exclude aliens possessing certain *characteristics*. Had Boutilier, after entering the United States in 1955, commenced leading a life of impeccable morality, section 212(a) (4) would still have been applicable to authorize his deportation. And, we emphasize that the section does not focus on Boutilier's post-entry behavior but on his condition at the time of entry into the United States. It is beyond contest that he was a homosexual long before leaving Canada. It is not without significance also that in *Fleuti*, the Court noted "the examining officer chose to rely heavily upon post-entry behavior." It may well be that the Court found it necessary, therefore, to determine whether the term "psychopathic personality" was sufficiently precise to afford adequate warning to Fleuti. In the case before us, however, while the Special Inquiry Officer credited Boutilier's sworn statement which described in detail the full history of his homosexual behavior, there is not the slightest indication that the Officer failed to understand that section 212(a) (4) was directed solely at a pre-entry condition. For these reasons, we do not consider *Fleuti* authoritative, and we believe that the order directing Boutilier's deportation did not constitute a denial of due process on the void-for-vagueness doctrine or any other grounds. We find that the clear design of Congress was to exclude homosexuals from entry into the country and this it has done in section 212(a) (4) by the use of the

13. In *De George*, the Supreme Court determined that the phrase "moral turpitude" appearing in the predecessor of section 241, 8 U.S.C. § 1251(a) was not unconstitutionally vague. Significantly, section 241 which authorizes deportation of aliens who are convicted of at least two crimes involving "moral turpitude" attempts, unlike section 212(a) (4), to regulate post-entry conduct.

14. See discussion of the legislative history of section 212(a) (4), supra.

words "psychopathic personality." It is not our function to sit in judgment on Congress' wisdom in enacting the law. "Courts must reconstruct the past solution imaginatively in its setting and project the purposes which inspired [the law] * * *." [15] L. Hand, "The Contribution of an Independent Judiciary to Civilization," published in The Spirit of Liberty (1953).

We have considered Boutilier's other contentions and find them to be without merit.

The petition for review is dismissed.

MOORE, Circuit Judge (dissenting):

The majority upholds the deportation of a young man who arrived in this country in 1955, who has worked hard and gainfully ever since, who is respected in his work, and most of whose close relatives—including his mother, his stepfather, and three of his five brothers and sisters—reside in this country. The majority does so on the grounds that at the time the petitioner entered this country at the age of 21, he could have been excluded as one "afflicted with psychopathic personality" under § 212(a) (4) of the Immigration and Nationality Act,

8 U.S.C. § 1182(a) (4), since he had had a number of homosexual experiences before coming to this country. The majority manifestly agrees with the Board of Immigration Appeals "that the term 'psychopathic personality' is a term of art and that it includes an alien upon mere proof that he is a homosexual."

Petitioner's homosexual experiences were revealed not in any proceeding at the time of original entry but solely as a voluntary disclosure some 8 years after entry (September 1963) in connection with a petition for naturalization. The admission of an arrest for sodomy in October 1959 (charge reduced and ultimately dismissed) led to a request for further information which petitioner again supplied voluntarily. The most adverse conclusion which can be derived from petitioner's statements is that petitioner engaged in sexual activity on a quite infrequent basis with both men and women during the five-year period before his coming to the United States.

Both the procedure and the statutory interpretation used by the immigration authorities in this deportation proceeding are not only offensive to, but, in my opinion, completely lacking in, due process, for interrelated reasons.

---

15. The dissent, while possessing *ad hominem* appeal, falls into error by improperly shifting the focus from a legal exegesis to a medical explanation of the term "psychopathic personality." As Judge Moore noted in his dissent in United States ex rel. Paktorovics v. Murff, 260 F.2d 610, 618 (2d Cir. 1958), "emotional reaction should not blind us to the fact that our immigration policy has been, and still should be, declared by Congress, and enforced by such officers of government as are so designated by Congress." Unfortunately, our dissenting colleague has failed to follow his own caveat.

Although his plea for "clemency" is quite moving, it is illustrative of the ease with which one can succumb in a case such as this to the temptation of permitting the emotions to overwhelm reason and enacted law. Congress has made its judgment, for better or worse, respecting the exclusion of homosexuals which we are not at liberty to alter. The dissent's parade of distinguished his-

torical personages allegedly possessing homosexual attributes does not detract one iota from that conclusion. Indeed, under the current version of section 212 (a) (4), see n. 10, supra, there is little doubt that some of these eminent gentlemen would be excludable.

Thus, while the house of horrors erected by our dissenting brother stimulates the imagination and arouses our sympathy, it is largely irrelevant. Congress studiously avoided turning this into a medical problem and did not authorize immigration officials to conduct a detailed psychiatric examination into the nature, frequency and variety of a particular homosexual's acts; rather, it enacted a clearcut rule of law: it determined that pre-entry homosexual behavior was to be a ground for exclusion. And, neither citations to the Sonnets of Michelangelo and Campanella, to the New York Times, nor even to Annie Get Your Gun will aid us in our statutory interpretation or change this simple fact of life.

Appellant was adjudged "afflicted with psychopathic personality" without any formal examination by qualified psychiatrists. The majority states that appellant's history was referred to the Public Health Service "for its expert views as to whether there are grounds for concluding that Boutilier was excludable * * *." The word-picture suggests a careful and particularized analysis by distinguished psychiatrists to determine whether appellant was so disturbed as to be "afflicted with psychopathic personality." Nothing could be further from what actually happened. The Public Health Service simply looked at appellant's statement in which he admitted having had homosexual experiences before he came to this country, and automatically stamped him a "psychopathic personality, sexual deviate," following the directive of the Public Health Service manual that under the category of psychopathic personality "will be classified those applicants who are diagnosed as sexual deviates." This was not the result of process, "due" or otherwise; it was the result of a mere fiat in a Public Health Service manual which labels as "psychopathic personalities" many who upon proper psychiatric examination might be found to possess no psychopathic symptoms.[1]

This lack of careful case-by-case determination cannot be upheld simply because this is a proceeding to deport rather than a proceeding to exclude. If anything, greater procedural safeguards are constitutionally required in cases of deportation than in cases of exclusion, because of the greater hardship involved in uprooting an alien from a country once he has developed economic and social ties there and slackened or severed those which bound him to his country of origin. Compare United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 70 S.Ct. 309, 94 L.Ed. 317 (1950) (alien can be excluded without a hearing) with The Japanese Immigrant Case, 189 U.S. 86, 101, 23 S.Ct. 611, 47 L.Ed. 721 (1903) (alien sought to be deported is constitutionally entitled to a hearing) and Kwong Hai Chew v. Colding, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953) (resident alien seeking re-entry is constitutionally entitled to a hearing); see also Wong Yang Sun v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950) (administrative hearing in deportation case must conform to the requirements of the Administrative Procedure Act).

The lack of careful—in fact the lack of any—medical examination and analysis was not peculiar to the proceedings against the present petitioner, but results from a long-standing statutory interpretation, promulgated by the immigration authorities and embodied in the Public Health Service manual, that mere proof of homosexuality constitutes a demonstration of the existence of "psychopathic personality." Under such circumstances, it would have been futile for the petitioner to request an examination by a board of Public Health Service doctors.

I cannot impute to Congress an intention that the term "psychopathic personality" in the 1952 amendments of the Immigration and Nationality Act be construed to cover anyone who had ever had a homosexual experience. Professor Kinsey estimated that "at least 37 per cent" of the American male population has at least one homosexual experience, defined in terms of physical contact to the point of orgasm, between the beginning of adolescence and old age. Kinsey, Pomeroy & Martin, Sexual Behavior in the Human Male 623 (1948). Earlier estimates had ranged from one per cent to 100 per cent. Id. at 616–622. The sponsors of Britain's current reform bill on homosexuality have indicated that one male in 25 is a homosexual in Britain.[2] To label a group so large "excludable aliens" would be tantamount to saying that Sappho,[3] Leonardo

---

1. See footnote 11 of the majority opinion.

2. N.Y.Times, July 6, 1966, § 1, p. 7, col. 1.

3. Whom Plato called the Tenth Muse. Loeb Classical Library, Greek Anthology, Vol. 3, p. 281. See Patrick, Sappho and the Island of Lesbos (1912).

da Vinci,[4] Michelangelo,[5] Andre Gide,[6] and perhaps even Shakespeare,[7] were they to come to life again, would be deemed unfit to visit our shores. Indeed, so broad a definition might well comprise more than a few members of legislative bodies.[8]

At most, the legislative history of the 1952 amendments indicates that Congress intended to exclude those who were "sexual deviates" at the time of entry into this country, see S.Rep. No. 1137, 82d Cong., 2d Sess. 9 (1952). The term "sexual deviate" suggests someone with a long-lasting and perhaps compulsive orientation towards homosexual or otherwise "abnormal" behavior. The Public Health Service report on which the House Judiciary Committee relied in its discussion of the bill as finally enacted, see H. R. Rep. No. 1365, 82d Cong., 2d Sess. 46–8 (1952), indicates a narrower definition of the term "psychopathic personality." That report states that "psychopathic personalities" are "disorders of the personality * * * characterized by developmental defects or pathological trends in the personality structure manifest by lifelong patterns of action or behavior," and that those "psychopathic personalities" who are "ill primarily in terms of society and the prevailing culture * * * frequently [evidently not always] include those * * * suffering from sexual deviation." U.S. Code Cong. & Ad. News, pp. 1700–1701, 82d Cong., 2d Sess. (1952). This legislative history suggests that Congress contemplated an inquiry in each case, to be performed by skilled psychiatrists, into whether the homosexual activity of a given individual amounted to such a "disorder of the personality" as to constitute "psychopathic personality."

Even assuming that Congress intended the term "psychopathic personality" to cover anyone who was a sexual deviate at the time of entry, petitioner had no way of knowing that "psychopathic personality" meant what Congress intended it to mean. "Psychopathic personality" may not be so vague as to be meaningless in all applications, as some have suggested, see Note, Limitations on Congressional Power to Deport Resident Aliens as Psychopaths at Time of Entry, 68 Yale L.J. 931 (1959), even though the Public Health Service itself has admitted that the term is "vague and indefinite." H.R. Rep. No. 1365, 82d Cong., 2d Sess. 46–7 (1952). The term "necessitates a personal estimate of community mores," ibid. at 943 n. 46; but so does the term "moral turpitude," held not unconstitutionally vague in Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951). Moreover, the term has been given some concreteness by judicial definition. See United States v. Flores-Rodriguez, 237 F.2d 405, 411 (2d Cir. 1956); United States ex rel. Leon v. Murff, 250 F.2d 436, 439 (2d Cir. 1937). However, the courts have said that those afflicted with "psychopathic personality" are "individuals who show a life-long * * * tendency not to conform to group customs, and who habitually misbehave so flagrantly that they are continually in trouble with the authorities." Flores-Rodriguez, supra, 237 F.2d at 411 (discussing the earlier statutory term "constitutional psychopathic inferiority," but suggesting that it was largely interchangeable with "psychopathic personality"); see Leon, supra, 250 F.2d at 439 (citing a Public Health Service regulation apparently no longer in effect providing that "[t]here shall be certified as

---

4. See The Notebooks of Leonardo da Vinci 189, 223 (P. Taylor ed. 1960).

5. Cf. Sonnets of Michelangelo and Campanella (J. A. Symonds trans. 1878).

6. Cf. Gide, L'Immoraliste (1902).

7. See, e. g., Sonnets 20, 33, 108.

8. Cf. remarks of Sir Cyril Osborne, opposing reintroduction into the House of Commons of the current British bill on homosexuality: "If this House were representative of the country, then there would be at least 30 homos in this House." Upon being asked to name them, however, Sir Cyril stated that in his 21 years in Parliament he had never encountered "one case of a homo in this House." N. Y. Times, July 6, 1966, § 1, p. 7, col. 1.

cases of constitutional psychopathic inferiority all psychopathic characters such as * * * persons who because of eccentric behavior, defective judgment or abnormal impulses are in repeated conflict with social customs and constitutional authorities"); see also Note, 68 Yale L.J. 931, 940 (1959) ("identifying characteristic" of "psychopathic personality" "is a long-standing pattern of culturally unacceptable behavior"). In the present case, there was no evidence to show that petitioner's sexual deviation was such as to put him in repeated conflict with the authorities. His discussion of his homosexual activities before and after his entry into this country indicates that they were consensual acts between adults, almost always in private places. Contrast *Flores-Rodriguez*, supra (blatant exhibitionist solicitation in public places). In short, neither the term "psychopathic personality" nor its interpretations by the courts prior to petitioner's entry gave petitioner "sufficiently definite warning * * * when measured by common understanding and practices," Jordan v. De George, 341 U.S. 223, 231–232, 71 S.Ct. 703 (1951), that his conduct could serve as a basis for exclusion or deportation.

Had the petitioner known that sexual deviation [9] at the time of entry would be automatic grounds for exclusion, there is considerable reason to believe that he could have modified his behavior so that he could not be considered a deviate at the time of entry. He was young, intelligent, and responsible. While he had engaged in homosexual acts from the age of 16 to the age of 21, he had also had sexual relations with women three or four times during this period. Dr. Montague Ullman, Director of Psychiatric Services in the Maimonides Hospital of Brooklyn and Professor of Psychiatry at the State University of New York, described petitioner's condition as late as March 1965 in the following terms:

"The patient has sexual interest in girls and has had intercourse with them on a number of occasions. * * * His sexual structure still appears fluid and immature so that he moves from homosexual to heterosexual interests as well as abstinence with almost equal facility. His homosexual orientation seems secondary to a very constricted, dependent personality pattern rather than occurring in the context of a psychopathic personality."

Another psychiatrist who examined petitioner, Dr. Edward F. Falsey, concluded that petitioner "is not psychotic" and that "the prognosis in therapy is reasonably good."

In brief, petitioner has been ordered deported because of the existence at the time of his entry into this country of a psychological condition which he probably would have been able to correct had he had any reasonable warning that the existence of the condition could serve as a basis for exclusion or, still more drastic, for deportation after entry. He received no warning. I agree with the Ninth Circuit that to uphold a deportation order under these circumstances is repugnant to due process. Fleuti v. Rosenberg, 302 F.2d 652 (9th Cir. 1962), remanded on other grounds, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); Lavoie v. United States Immigration and Naturalization Service, 360 F.2d 27 (9th Cir. 1966).

9. A term which itself raises problems of vagueness. Deviation from what norm? When so much attention is being focused on sexual practices, see, e. g., Kinsey, Pomeroy & Martin, op. cit. supra, and Masters & Johnson, Human Sexual Response (1966), and when so many efforts, scientific and otherwise, are being made to discover how the human race can become adjusted to doing what should come naturally, cf. Berlin, Annie Get Your Gun 21 (1947), it must be realized that sexual gratification is often achieved in divers ways which may well deviate from popular conceptions of a norm.