BOUTILIER v. IMMIGRATION AND
NATURALIZATION SERVICE.

No. 440. Argued March 14, 1967.—Decided May 22, 1967.

*Blanch Freedman* argued the cause for petitioner.
With her on the briefs was *Robert Brown.*

*Nathan Lewin* argued the cause for respondent. On
the brief were *Solicitor General Marshall, Assistant
Attorney General Vinson* and *Philip R. Monahan.*

Briefs of *amici curiae,* urging reversal, were filed by
*David Carliner, Nanette Dembitz* and *Alan H. Levine*
for the American Civil Liberties Union et al., and by
the Homosexual Law Reform Society of America.

MR. JUSTICE CLARK delivered the opinion of the Court.

The petitioner, an alien, has been ordered deported
to Canada as one who upon entry into this country was
a homosexual and therefore "afflicted with psychopathic
personality" and excludable under § 212 (a)(4) of the
Immigration and Nationality Act of 1952, 66 Stat. 182,
8 U. S. C. § 1182 (a)(4).* Petitioner's appeal from the

---

*"SEC. 212. (a) Except as otherwise provided in this Act, the
following classes of aliens shall be ineligible to receive visas and
shall be excluded from admission into the United States:

.        .        .        .        .

"(4) Aliens afflicted with psychopathic personality, epilepsy, or a
mental defect . . . ."

Section 241 (a)(1) of the Immigration and Nationality Act,
66 Stat. 204, 8 U. S. C. § 1251 (a)(1), provides that: "Any alien in

finding of the Special Inquiry Officer was dismissed by the Board of Immigration Appeals, without opinion, and his petition for review in the Court of Appeals was dismissed, with one judge dissenting. 363 F. 2d 488. It held that the term "psychopathic personality," as used by the Congress in § 212 (a)(4), was a term of art intended to exclude homosexuals from entry into the United States. It further found that the term was not void for vagueness and was, therefore, not repugnant to the Fifth Amendment's Due Process Clause. We granted certiorari, 385 U. S. 927, and now affirm.

## I.

Petitioner, a Canadian national, was first admitted to this country on June 22, 1955, at the age of 21. His last entry was in 1959, at which time he was returning from a short trip to Canada. His mother and stepfather and three of his brothers and sisters live in the United States. In 1963 he applied for citizenship and submitted to the Naturalization Examiner an affidavit in which he admitted that he was arrested in New York in October 1959, on a charge of sodomy, which was later reduced to simple assault and thereafter dismissed on default of the complainant. In 1964, petitioner, at the request of the Government, submitted another affidavit which revealed the full history of his sexual deviate behavior. It stated that his first homosexual experience occurred when he was 14 years of age, some seven years before his entry into the United States. Petitioner was evidently a passive participant in this encounter. His next episode was at age 16 and occurred in a public park in Halifax, Nova Scotia. Petitioner was the active participant in this affair. During the next five years immediately preceding

the United States . . . shall, upon the order of the Attorney General, be deported who—(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry . . . ."

his first entry into the United States petitioner had homosexual relations on an average of three or four times a year. He also stated that prior to his entry he had engaged in heterosexual relations on three or four occasions. During the eight and one-half years immediately subsequent to his entry, and up to the time of his second statement, petitioner continued to have homosexual relations on an average of three or four times a year. Since 1959 petitioner had shared an apartment with a man with whom he had had homosexual relations.

The 1964 affidavit was submitted to the Public Health Service for its opinion as to whether petitioner was excludable for any reason at the time of his entry. The Public Health Service issued a certificate in 1964 stating that in the opinion of the subscribing physicians petitioner "was afflicted with a class A condition, namely, psychopathic personality, sexual deviate" at the time of his admission. Deportation proceedings were then instituted. "No serious question," the Special Inquiry Officer found, "has been raised either by the respondent [petitioner here], his counsel or the psychiatrists [employed by petitioner] who have submitted reports on the respondent as to his sexual deviation." Indeed, the officer found that both of petitioner's psychiatrists "concede that the respondent has been a homosexual for a number of years but conclude that by reason of such sexual deviation. the respondent is not a psychopathic personality." Finding against petitioner on the facts, the issue before the officer was reduced to the purely legal question of whether the term "psychopathic personality" included homosexuals and if it suffered illegality because of vagueness.

## II.

The legislative history of the Act indicates beyond a shadow of a doubt that the Congress intended the phrase "psychopathic personality" to include homosexuals such as petitioner.

Prior to the 1952 Act the immigration law excluded "persons of constitutional psychopathic inferiority." 39 Stat. 875, as amended, 8 U. S. C. § 136 (a) (1946 ed.). Beginning in 1950, a subcommittee of the Senate Committee on the Judiciary conducted a comprehensive study of the immigration laws and in its report found "that the purpose of the provision against 'persons with constitutional psychopathic inferiority' will be more adequately served by changing that term to 'persons afflicted with psychopathic personality,' and that the classes of mentally defectives should be enlarged to include homosexuals and other sex perverts." S. Rep. No. 1515, 81st Cong., 2d Sess., p. 345. The resulting legislation was first introduced as S. 3455 and used the new phrase "psychopathic personality." The bill, however, contained an additional clause providing for the exclusion of aliens "who are homosexuals or sex perverts." As the legislation progressed (now S. 2550 in the 82d Congress), however, it omitted the latter clause "who are homosexuals or sex perverts" and used only the phrase "psychopathic personality." The omission is explained by the Judiciary Committee Report on the bill:

"The provisio[n] of S. 716 [one of the earlier bills not enacted] which specifically excluded homosexuals and sex perverts as a separate excludable class does not appear in the instant bill. The Public Health Service has advised that the provision for the exclusion of aliens afflicted with psychopathic personality or a mental defect which appears in the instant bill is sufficiently broad to provide for the exclusion of homosexuals and sex perverts. *This change of nomenclature is not to be construed in any way as modifying the intent to exclude all aliens who are sexual deviates.*" (Emphasis supplied.) S. Rep. No. 1137, 82d Cong., 2d Sess., p. 9.

Likewise, a House bill, H. R. 5678, adopted the position of the Public Health Service that the phrase "psychopathic personality" excluded from entry homosexuals and sex perverts. The report that accompanied the bill shows clearly that the House Judiciary Committee adopted the recommendation of the Public Health Service that "psychopathic personality" should be used in the Act as a phrase that would exclude from admission homosexuals and sex perverts. H. R. Rep. No. 1365, 82d Cong., 2d Sess. It quoted at length, and specifically adopted, the Public Health Service report which recommended that the term "psychopathic personality" be used to "specify such types of pathologic behavior as homosexuality or sexual perversion." We, therefore, conclude that the Congress used the phrase "psychopathic personality" not in the clinical sense, but to effectuate its purpose to exclude from entry all homosexuals and other sex perverts.

Petitioner stresses that only persons *afflicted* with psychopathic personality are excludable. This, he says, is "a condition, physical or psychiatric, which may be manifested in different ways, including sexual behavior." Petitioner's contention must fall by his own admissions. For over six years prior to his entry petitioner admittedly followed a continued course of homosexual conduct. The Public Health Service doctors found and certified that at the time of his entry petitioner "was afflicted with a class A condition, namely, psychopathic personality, sexual deviate . . . ." It was stipulated that if these doctors were to appear in the case they would testify to this effect and that "no useful purpose would be served by submitting this additional psychiatric material [furnished by petitioner's doctors] to the United States Public Health Service . . . ." The Government clearly established that petitioner was a homosexual at entry. Having substantial support in the record, we do not now disturb that finding, especially since petitioner admitted

being a homosexual at the time of his entry. The existence of this condition over a continuous and uninterrupted period prior to and at the time of petitioner's entry clearly supports the ultimate finding upon which the order of deportation was based.

### III.

Petitioner says, even so, the section as construed is constitutionally defective because it did not adequately warn him that his sexual affliction at the time of entry could lead to his deportation. It is true that this Court has held the "void for vagueness" doctrine applicable to civil as well as criminal actions. See *Small Co.* v. *Am. Sugar Ref. Co.*, 267 U. S. 233, 239 (1925). However, this is where "the exaction of obedience to a rule or standard . . . was so vague and indefinite as really to be no rule or standard at all. . . ." In short, the exaction must strip a participant of his rights to come within the principle of the cases. But the "exaction" of § 212 (a)(4) never applied to petitioner's conduct after entry. The section imposes neither regulation of nor sanction for conduct. In this situation, therefore, no necessity exists for guidance so that one may avoid the applicability of the law. The petitioner is not being deported for conduct engaged in after his entry into the United States, but rather for characteristics he possessed *at the time of* his entry. Here, when petitioner first presented himself at our border for entrance, he was already afflicted with homosexuality. The pattern was cut, and under it he was not admissible.

The constitutional requirement of fair warning has no applicability to standards such as are laid down in § 212 (a)(4) for admission of aliens to the United States. It has long been held that the Congress has plenary power to make rules for the admission of aliens and to exclude those who possess those characteristics which Congress has forbidden. See *The Chinese Exclusion Case,*

124

130 U. S. 581 (1889). Here Congress commanded that homosexuals not be allowed to enter. The petitioner was found to have that characteristic and was ordered deported. The basis of the deportation order was his affliction for a long period of time *prior to entry, i. e.,* six and one-half years before his entry. It may be, as some claim, that "psychopathic personality" is a medically ambiguous term, including several separate and distinct afflictions. Noyes, Modern Clinical Psychiatry 410 (3d ed. 1948). But the test here is what the Congress intended, not what differing psychiatrists may think. It was not laying down a clinical test, but an exclusionary standard which it declared to be inclusive of those having homosexual and perverted characteristics. It can hardly be disputed that the legislative history of § 212 (a)(4) clearly shows that Congress so intended.

But petitioner says that he had no warning and that no interpretation of the section had come down at the time of his 1955 entry. Therefore, he argues, he was unaware of the fact that homosexual conduct engaged in after entry could lead to his deportation. We do not believe that petitioner's post-entry conduct is the basis for his deportation order. At the time of his first entry he had continuously been afflicted with homosexuality for over six years. To us the statute is clear. It fixes "the time of entry" as the crucial date and the record shows that the findings of the Public Health Service doctors and the Special Inquiry Officer all were based on that date. We find no indication that the post-entry evidence was of any consequence in the ultimate decision of the doctors, the hearing officer or the court. Indeed, the proof was uncontradicted as to petitioner's characteristic at the time of entry and this brought him within the excludable class. A standard applicable solely to time of entry could hardly be vague as to post-entry conduct.

The petitioner raises other points, including the claim that an "arriving alien" under the Act is entitled to medical examination. Since he is not an "arriving alien" subject to exclusion, but a deportable alien within an excludable class—who through error was permitted entry—it is doubtful if the requirement would apply. But we need not go into the question since petitioner was twice offered examination and refused to submit himself. He can hardly be heard to complain now. The remaining contentions are likewise without merit.

*Affirmed.*

MR. JUSTICE BRENNAN dissents for the reasons stated by Judge Moore of the Court of Appeals, 363 F. 2d 488, 496–499.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE FORTAS concurs, dissenting.

The term "psychopathic personality" is a treacherous one like "communist" or in an earlier day "Bolshevik." A label of this kind when freely used may mean only an unpopular person. It is much too vague by constitutional standards for the imposition of penalties or punishment.

Cleckley defines "psychopathic personality" as one who has the following characteristics:

(1) Superficial charm and good "intelligence." (2) Absence of delusions and other signs of irrational "thinking." (3) Absence of "nervousness" or psychoneurotic manifestations. (4) Unreliability. (5) Untruthfulness and insincerity. (6) Lack of remorse or shame. (7) Inadequately motivated antisocial behavior. (8) Poor judgment and failure to learn by experience. (9) Pathologic egocentricity and incapacity for love. (10) General poverty in major affective reactions. (11) Specific loss of insight.

(12) Unresponsiveness in general interpersonal relations. (13) Fantastic and uninviting behavior with drink and sometimes without. (14) Suicide rarely carried out. (15) Sex life impersonal, trivial and poorly integrated. (16) Failure to follow any life plan. Cleckley, The Mask of Sanity 238–255 (1941).

The word "psychopath" according to some means "a sick mind." Guttmacher & Weihofen, Psychiatry and the Law 86 (1952):

> "In the light of present knowledge, most of the individuals called psychopathic personalities should probably be considered as suffering from neurotic character disorders. They are, for the most part, unhappy persons, harassed by tension and anxiety, who are struggling against unconscious conflicts which were created during the very early years of childhood. The nature and even the existence of these conflicts which drive them restlessly on are unknown to them. When the anxiety rises to a certain pitch, they seek relief through some antisocial act. The frequency with which this pattern recurs in the individual is dependent in part upon the intensity of the unconscious conflict, upon the tolerance for anxiety, and upon chance environmental situations which may heighten or decrease it. One of the chief diagnostic criteria of this type of neurotically determined delinquency is the repetitiveness of the pattern. The usual explanation, as for example, that the recidivistic check-writer has just 'got in the habit of writing bad checks' is meaningless." *Id.*, at 88–89.

Many experts think that it is a meaningless designation. "Not yet is there any common agreement . . . as to classification or . . . etiology." Noyes, Modern Clinical Psychiatry 410 (3d ed. 1948). "The only conclusion that seems warrantable is that, at some time or

other and by some reputable authority, the term psychopathic personality has been used to designate every conceivable type of abnormal character." Curran & Mallinson, Psychopathic Personality, 90 J. Mental Sci. 266, 278. See also Guttmacher, Diagnosis and Etiology of Psychopathic Personalities as Perceived in Our Time, in Current Problems in Psychiatric Diagnosis 139, 154 (Hoch & Zubin ed. 1953); Tappan, Sexual Offences and the Treatment of Sexual Offenders in the United States, in Sexual Offences 500, 507 (Radzinowicz ed. 1957). It is much too treacherously vague a term to allow the high penalty of deportation to turn on it.

When it comes to sex, the problem is complex. Those "who fail to reach sexual maturity (hetero-sexuality), and who remain at a narcissistic or homosexual stage" are the products "of heredity, of glandular dysfunction, [or] of environmental circumstances." Henderson, Psychopathic Constitution and Criminal Behaviour, in Mental Abnormality and Crime 105, 114 (Radzinowicz & Turner ed. 1949).

The homosexual is one, who by some freak, is the product of an arrested development:

> "All people have originally bisexual tendencies which are more or less developed and which in the course of time normally deviate either in the direction of male or female. This may indicate that a trace of homosexuality, no matter how weak it may be, exists in every human being. It is present in the adolescent stage, where there is a considerable amount of undifferentiated sexuality." Abrahamsen, Crime and the Human Mind 117 (1944).

Many homosexuals become involved in violations of laws; many do not. Kinsey reported:

> "It is not possible to insist that any departure from the sexual mores, or any participation in socially taboo activities, always, or even usually, in-

volves a neurosis or psychosis, for the case histories abundantly demonstrate that most individuals who engage in taboo activities make satisfactory social adjustments. There are, in actuality, few adult males who are particularly disturbed over their sexual histories. Psychiatrists, clinical psychologists, and others who deal with cases of maladjustment, sometimes come to feel that most people find difficulty in adjusting their sexual lives; but a clinic is no place to secure incidence figures. The incidence of tuberculosis in a tuberculosis sanitarium is no measure of the incidence of tuberculosis in the population as a whole; and the incidence of disturbance over sexual activities, among the persons who come to a clinic, is no measure of the frequency of similar disturbances outside of clinics. The impression that such 'sexual irregularities' as 'excessive' masturbation, pre-marital intercourse, responsibility for a pre-marital pregnancy, extra-marital intercourse, mouth-genital contacts, homosexual activity, or animal intercourse, always produce psychoses and abnormal personalities is based upon the fact that the persons who do go to professional sources for advice are upset by these things.

"It is unwarranted to believe that particular types of sexual behavior are always expressions of psychoses or neuroses. In actuality, they are more often expressions of what is biologically basic in mammalian and anthropoid behavior, and of a deliberate disregard for social convention. Many of the socially and intellectually most significant persons in our histories, successful scientists, educators, physicians, clergymen, business men, and persons of high position in governmental affairs, have socially taboo items in their sexual histories, and among them they have accepted nearly the whole range

of so-called sexual abnormalities. Among the so-
cially most successful and personally best adjusted
persons who have contributed to the present study,
there are some whose rates of outlet are as high as
those in any case labelled nymphomania or satyriasis
in the literature, or recognized as such in the clinic."
Kinsey, Sexual Behavior in the Human Male 201–
202 (1948).

It is common knowledge that in this century homo-
sexuals have risen high in our own public service—both
in Congress and in the Executive Branch—and have
served with distinction. It is therefore not credible that
Congress wanted to deport everyone and anyone who
was a sexual deviate, no matter how blameless his social
conduct had been nor how creative his work nor how
valuable his contribution to society. I agree with Judge
Moore, dissenting below, that the legislative history
should not be read as imputing to Congress a purpose
to classify under the heading "psychopathic personality"
every person who had ever had a homosexual experience:

> "Professor Kinsey estimated that 'at least 37 per
> cent' of the American male population has at least
> one homosexual experience, defined in terms of phys-
> ical contact to the point of orgasm, between the be-
> ginning of adolescence and old age.[1] Kinsey, Pom-

---

[1] "Homosexual activity in the human male is much more frequent
than is ordinarily realized . . . . In the youngest unmarried group,
more than a quarter (27.3%) of the males have some homosexual
activity to the point of orgasm . . . . The incidence among these
single males rises in successive age groups until it reaches a maximum
of 38.7 per cent between 36 and 40 years of age.

"High frequencies do not occur as often in the homosexual as they
do in some other kinds of sexual activity . . . . Populations are more
homogeneous in regard to this outlet. This may reflect the diffi-
culties involved in having frequent and regular relations in a socially
taboo activity. Nevertheless, there are a few of the younger ado-
lescent males who have homosexual frequencies of 7 or more per

130

eroy & Martin, Sexual Behavior in the Human Male 623 (1948). Earlier estimates had ranged from one per cent to 100 per cent. Id. at 616–622. The sponsors of Britain's current reform bill on homosexuality have indicated that one male in 25 is a homosexual in Britain.[2] To label a group so large 'excludable aliens' would be tantamount to saying that Sappho, Leonardo da Vinci, Michelangelo, Andre Gide, and perhaps even Shakespeare, were they to come to life again, would be deemed unfit to visit our shores.[3] Indeed, so broad a definition might well comprise more than a few members of legislative bodies." 363 F. 2d 488, 497–498.

The Public Health Service, from whom Congress borrowed the term "psychopathic personality" (H. R. Rep. No. 1365, 82d Cong., 2d Sess., 46–47) admits that the term is "vague and indefinite." Id., at 46.

---

week, and between 26 and 30 the maximum frequencies run to 15 per week. By 50 years of age the most active individual is averaging only 5.0 per week.

"For single, active populations, the mean frequencies of homosexual contacts . . . rise more or less steadily from near once per week . . . for the younger adolescent boys to nearly twice as often . . . for males between the ages of 31 and 35. They stand above once a week through age 50." Kinsey, Sexual Behavior in the Human Male 259–261 (1948).

[2] Report, Committee on Homosexual Offenses and Prostitution (1957).

[3] Sigmund Freud wrote in 1935:

"Homosexuality is assuredly no advantage, but it is nothing to be ashamed of, no vice, no degradation, it cannot be classified as an illness; we consider it to be a variation of the sexual function produced by a certain arrest of sexual development. Many highly respectable individuals of ancient and modern times have been homosexuals, several of the greatest men among them (Plato, Michelangelo, Leonardo da Vinci, etc.). It is a great injustice to persecute homosexuality as a crime, and cruelty too. If you do not believe me, read the books of Havelock Ellis." Ruitenbeek, The Problem of Homosexuality in Modern Society 1 (1963).

If we are to hold, as the Court apparently does, that any acts of homosexuality suffice to deport the alien, whether or not they are part of a fabric of antisocial behavior, then we face a serious question of due process. By that construction a person is judged by a standard that is almost incapable of definition. I have already quoted from clinical experts to show what a wide range the term "psychopathic personality" has. Another expert [4] classifies such a person under three headings:

*Acting:* (1) inability to withstand tedium, (2) lack of a sense of responsibility, (3) a tendency to "blow up" under pressure, (4) maladjustment to law and order, and (5) recidivism.

*Feeling:* they tend to (1) be emotionally deficient, narcissistic, callous, inconsiderate, and unremorseful, generally projecting blame on others, (2) have hair-trigger emotions, exaggerated display of emotion, and be irritable and impulsive, (3) be amoral (socially and sexually) and (4) worry, but do nothing about it.

*Thinking:* they display (1) defective judgment, living for the present rather than for the future, and (2) inability to profit from experience, *i. e.,* they are able to realize the consequences intelligently, but not to evaluate them.

We held in *Jordan* v. *De George,* 341 U. S. 223, that the crime of a conspiracy to defraud the United States of taxes involved "moral turpitude" and made the person subject to deportation. That, however, was a term that has "deep roots in the law." *Id.,* at 227. But the grab-bag—"psychopathic personality"—has no "deep roots" whatsoever.[5] Caprice of judgment is almost certain under this broad definition. Anyone can be caught who is unpopular, who is off-beat, who is nonconformist.

---

[4] Caldwell, Constitutional Psychopathic State (Psychopathic Personality) Studies of Soldiers in the U. S. Army, 3 J. Crim. Psychopathology 171–172 (1941).

[5] See Lindman & McIntyre, The Mentally Disabled and the Law 299 (1961).

Deportation is the equivalent to banishment or exile. *Fong Haw Tan* v. *Phelan,* 333 U. S. 6, 10. Though technically not criminal, it practically may be. The penalty is so severe that we have extended to the resident alien the protection of due process. *Wong Yang Sung* v. *McGrath,* 339 U. S. 33. Even apart from deportation cases, we look with suspicion at those delegations of power so broad as to allow the administrative staff the power to formulate the fundamental policy. See *Watkins* v. *United States,* 354 U. S. 178, 203–205; *Kent* v. *Dulles,* 357 U. S. 116. In the *Watkins* case we were protecting important First Amendment rights. In the *Kent* case we were protecting the right to travel, an important ingredient of a person's "liberty" within the meaning of the Fifth Amendment. We deal here also with an aspect of "liberty" and the requirements of due process. They demand that the standard be sufficiently clear as to forewarn those who may otherwise be entrapped and to provide full opportunity to conform. "Psychopathic personality" is so broad and vague as to be hardly more than an epithet. The Court seeks to avoid this question by saying that the standard being applied relates only to what petitioner had done prior to his entry, not to his postentry conduct. *But at least half of the questioning of this petitioner related to his postentry conduct.*

Moreover, the issue of deportability under § 212 (a) of the Immigration and Nationality Act of 1952 turns on whether petitioner is "afflicted with psychopathic personality." On this I think he is entitled to a hearing to satisfy both the statute and the requirement of due process.

One psychiatrist reported:

"On psychiatric examination of Mr. Boutilier, there was no indication of delusional trend or hallucinatory phenomena. He is not psychotic. From his own account, he has a psychosexual problem

but is beginning treatment for this disorder. Diagnostically, I would consider him as having a Character Neurosis, believe that the prognosis in therapy is reasonably good and do not think he represents any risk of decompensation into a dependent psychotic reaction nor any potential for frank criminal activity."

Another submitted a long report ending as follows:

"The patient's present difficulties obviously weigh very heavily upon him. He feels as if he has made his life in this country and is deeply disturbed at the prospect of being cut off from the life he has created for himself. He talks frankly about himself. What emerged out of the interview was not a picture of a psychopath but that of a dependent, immature young man with a conscience, an awareness of the feelings of others and a sense of personal honesty. His sexual structure still appears fluid and immature so that he moves from homosexual to heterosexual interests as well as abstinence with almost equal facility. His homosexual orientation seems secondary to a very constricted, dependent personality pattern rather than occurring in the context of a psychopathic personality. My own feeling is that his own need to fit in and be accepted is so great that it far surpasses his need for sex in any form.

"I do not believe that Mr. Boutilier is a psychopath."

In light of these statements, I cannot say that it has been determined that petitioner was "afflicted" in the statutory sense either at the time of entry or at present. "Afflicted" means possessed or dominated by. Occasional acts would not seem sufficient. "Afflicted" means a way of life, an accustomed pattern of conduct. Whatever disagreement there is as to the meaning of "psycho-

pathic personality," it has generally been understood to refer to a consistent, lifelong pattern of behavior conflicting with social norms without accompanying guilt. Cleckley, *supra,* at 29.[6]   Nothing of that character was

[6] There is good indication that Congress intended the term "afflicted with psychopathic personality" to refer only to those individuals demonstrating "developmental defects or pathological trends in the personality structure manifest[ed] by lifelong patterns of action or behavior . . . ." U. S. Public Health Service, Report on Medical Aspects of H. R. 2379, U. S. Code Cong. & Admin. News 1700 (1952).   The provision for exclusion of persons afflicted with psychopathic personality replaced the section of the 1917 Act, 39 Stat. 875, providing for the exclusion of "persons of constitutional psychopathic inferiority."   The purpose of that clause was "to keep out 'tainted blood,' that is, 'persons who have medical traits which would harm the people of the United States if those traits were introduced in this country, or if those possessing those traits were added to those in this country who unfortunately are so afflicted.' " The Immigration and Naturalization Systems of the United States, S. Rep. No. 1515, 81st Cong., 2d Sess., 343 (1950).   The Senate subcommittee which had been charged with making an investigation of the immigration laws concluded that "the exclusion of persons with 'constitutional psychopathic inferiority' was aimed at keeping out of the country aliens with a propensity to mental aberration, those with an inherent likelihood of becoming mental cases, as indicated by their case history." *Ibid.*   It concluded that "the purpose of the provision against 'persons with constitutional psychopathic inferiority' will be more adequately served by changing that term to 'persons afflicted with psychopathic personality,' and that the classes of mentally defectives should be enlarged to include homosexuals and other sex perverts." *Id.,* at 345.   Senate Report 1515 accompanied Senate bill 3455, which included among excludable aliens "[a]liens afflicted with psychopathic personality," and "[a]liens who are homosexuals or sex perverts."   The bill was redrafted and became S. 716, with its counterpart in the House being H. R. 2379; the material provisions remained the same as in S. 3455.   In response to the House's request for its opinion on the new provisions, the Public Health Service noted that:

"The conditions classified within the group of psychopathic personalities are, in effect, disorders of the personality. They are characterized by developmental defects or pathological trends in the personality structure manifest by lifelong patterns of action or

shown to exist at the time of entry. The fact that he presently has a problem, as one psychiatrist said, does not mean that he is or was necessarily "afflicted" with homosexuality. His conduct is, of course, evidence material to the issue. But the informed judgment of experts is needed to make the required finding. We cruelly mutilate the Act when we hold otherwise. For we make the word of the bureaucrat supreme, when it was the expertise of the doctors and psychiatrists on which Congress wanted the administrative action to be dependent.

---

behavior, rather than by mental or emotional symptoms. Individuals with such a disorder may manifest a disturbance of intrinsic personality patterns, exaggerated personality trends, or are persons ill primarily in terms of society and the prevailing culture. The latter or sociopathic reactions are frequently symptomatic of a severe underlying neurosis or psychosis and frequently include those groups of individuals suffering from addiction or sexual deviation." U. S. Code Cong. & Admin. News 1700 (1952).

The letter setting forth the views of the Public Health Service went on to say, with respect to the exclusion of "homosexuals or sex perverts":

"Ordinarily, persons suffering from disturbances in sexuality are included within the classification of 'psychopathic personality with pathologic sexuality.' This classification will specify such types of pathologic behavior as homosexuality or sexual perversion which includes sexual sadism, fetishism, transvestism, pedophilia, etc." *Id.*, at 1701. The bill which was finally enacted, H. R. 5678, provided for exclusion of "[a]liens afflicted with psychopathic personality," but did not provide for exclusion of aliens who are homosexuals or sex perverts, as had its predecessors. The House Report, H. R. Rep. No. 1365, which accompanied the bill incorporated the full report of the Public Health Service (H. R. Rep. No. 1365, 82d Cong., 2d Sess., at 46–48) and indicated that the "recommendations contained in the . . . report have been followed." *Id.*, at 48.

This legislative history indicates that the term "afflicted with psychopathic personality" was used in a medical sense and was meant to refer to lifelong patterns of action that are pathologic and symptomatic of grave underlying neurosis or psychosis. Homosexuality and sex perversion, as a subclass, are limited to the same afflictions.