December 10, 1979

## 79-85    MEMORANDUM OPINION FOR THE ACTING COMMISSIONER, IMMIGRATION AND NATURALIZATION SERVICE

### Immigration and Nationality Act (8 U.S.C. § 1182)—Immigration and Naturalization Service—Public Health Service—Homosexuality as Grounds for Exclusion

This responds to your inquiry concerning the legal authority of the Surgeon General to direct the Public Health Service (PHS) medical officers[1] not to certify arriving homosexual aliens as possessing a "mental defect or disease" solely because of their homosexuality.

Under § 212(a)(4) of the Immigration and Nationality Act of 1952, as amended ("the Act"), 8 U.S.C. § 1182(a)(4), Congress requires the exclusion of homosexual aliens from the United States. Enforcement of the Act's exclusionary provision is a joint responsibility of the Immigration and Naturalization Service (INS) and the PHS.[2] The INS performs examinations of all arriving aliens other than mental or physical examinations, 8 U.S.C. § 1225, and it administratively adjudicates the admissibility *vel non* of aliens in doubtful cases, 8 U.S.C. § 1226. Upon referrals from INS officers, the PHS then conducts physical and mental examinations of arriving aliens, and certifies "for the information of [INS officers], any physical or mental defect or disease observed" in aliens so examined. Since 1952, the exclusion of homosexual aliens has been enforced both

---

[1] Physical and mental examinations of arriving aliens may be performed by medical officers of the Public Health Service or civil surgeons qualified as specified in 8 U.S.C. § 1224. References in this memorandum to medical officers of the Public Health Service are intended to include both groups of examining physicians.

[2] Except when referring to specific documents, our understanding of the facts and of the agencies' positions is based on an October 18, 1979 meeting between you, members of your staff, the General Counsel of the Department of Health, Education and Welfare, and members of this Office.

unilaterally by the INS, *e.g.,* relying on an alien's admission of homosexuality and jointly, subsequent to a certification by the PHS that particular aliens are afflicted with a "mental defect or disease," *i.e.,* homosexuality. You indicate, however, that in the past several years, the number of referrals to the PHS has increased significantly.

On August 2, 1979, the Surgeon General and Assistant Secretary for Health of the Department of Health, Education and Welfare (HEW), issued a memorandum declaring that "homosexuality *per se* will no longer be considered [by the PHS] a 'mental disease or defect,'" and that "the determination of homosexuality is not made through a medical diagnostic procedure;" he indicated that INS officers would be advised to stop referring aliens to the PHS for mental examinations solely on the ground of suspected homosexuality.

You have questioned the Surgeon General's authority to make these determinations and have inquired concerning the impact of his memorandum on the enforceability of the Act. For reasons stated below, we conclude: Congress clearly intended that homosexuality be included in the statutory phrase "mental defect or disease," and the Surgeon General has no authority to determine that homosexuality is not a "mental defect or disease" for purposes of applying the Act; if the Surgeon General has determined, as a matter of fact, that it is impossible for the PHS medically to diagnose homosexuality, the referral of aliens to the PHS for certification of homosexuality would be unhelpful; and the INS is statutorily required to enforce the exclusion of homosexual aliens, even though the Surgeon General has directed the PHS no longer to assist in this enforcement.

## I.  Homosexuality as a "Mental Defect or Disease"

The first policy promulgated by the Surgeon General's memorandum is: "[H]omosexuality per se will no longer be considered [by the PHS] a 'mental disease or defect.'" The asserted consequence of this finding is that PHS medical officers will no longer certify that any alien referred to them for physical and mental examination possesses a "mental defect or disease," within the meaning of 8 U.S.C. § 1224, solely on the ground of homosexuality. For the reasons that follow, we conclude that the Surgeon General has no authority to exclude homosexuality from the coverage of the phrase "mental defect or disease" as used in the Act.

Under 8 U.S.C. § 1224, PHS medical officers conduct mental and physical examinations of arriving aliens "under such administrative regulations as the Attorney General may prescribe, and under medical regulations prepared by the Surgeon General of the United States Public Health Service." Under this provision, the Surgeon General is empowered reasonably to regulate the PHS's medical functions. To whatever extent intended by Congress, this authority would appear on its face to include discretion to promulgate policies regarding the description and diagnosis of disease. *See, e.g.,* 42 CFR § 34.2(b), 34.4 (1978).

However, it is elementary that the Surgeon General may not redefine terms in a statute that have rationally been given certain and specific meaning by Congress:

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity. [*Manhattan General Equip. Co.* v. *Commissioner of Internal Revenue,* 297 U.S. 129, 134 (1936). *See also, United States* v. *Larionoff,* 431 U.S. 864, 873, and note 12 (1977), and cases cited therein.]

Where Congress has classified homosexuality as a disease and requires on that ground the exclusion of homosexual aliens, the Surgeon General has no authority to disregard or to change the statute administratively.

Neither the INS nor the PHS questions that Congress intended, under 8 U.S.C. § 1182(a)(4), to exclude homosexual aliens from the United States. That section provides:

> (a)   Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:
>
> \*   \*   \*   \*   \*   \*   \*
>
> (4)   Aliens afflicted with psychopathic personality, sexual deviation, or a mental defect; \* \* \*

Although the "(a)(4) exclusions" do not expressly refer to homosexuals, the legislative history of the 1952 enactment and its 1965 amendment, as well as the interpretation of the 1952 provisions by the Supreme Court in 1967, conclusively establish that Congress intended to include homosexuals within their terms. *Boutilier* v. *INS,* 387 U.S. 118 (1967).[1]

There is no doubt that Congress intended homosexuality to be a "mental defect or disease" as those words are used in the Act. It included homosexuals within medical categories, *i.e.,* "psychopathic personality, sexual deviation, and mental defect." Its determination to exclude homosexual aliens from admission was based on the recommendations concerning medical exclusions made by the Senate Judiciary Committee in 1950:

> The subcommittee believes, however, that the purpose of the provision [of the Immigration Act of 1917] against "persons with constitutional psychopathic inferiority" will be more adequately served by changing that term to "persons afflicted with

---

[1]On the relevant history of the original enactment, *see* Letter from Acting Surgeon General J. Masur to Representative Francis E. Walter (May 15, 1951), reprinted at H. Rept. 1365, 82d Cong., 2d sess. 45 (1952), and the discussion in S. Rept. 1137, Pt. 1, 82d Cong., 2d sess. 9 (1952). On the 1965 amendment, in which Congress, in response to the court's holding in *Fleuti* v. *Rosenberg,* 302 F.(2d) 652 (9th Cir. 1962), added the term "sexual deviation" to 8 U.S.C. § 1182(a)(4), *see* H. Rept. 745, 89th Cong., 1st sess. 16 (1965), and S. Rept. 748, 89th Cong., 1st sess. 19 (1965).

459

psychopathic personality,'' and that the classes of mentally [sic] defectives should be enlarged to include homosexuals and other sex perverts. [S. Rept. 1515, 81st Cong., 2d sess. 345 (1950).]

The House Judiciary Committee, describing the original (a)(4) provisions as enacted in 1952, referred to them as ''medical grounds for exclusion.'' H. Rept. 1365, 82d Cong., 2d sess. 45 (1952).

Finally, 8 U.S.C. § 1224, providing that PHS medical officers shall certify ''any physical and mental defect or disease'' observed in the arriving aliens they examine, also requires that these officers be provided with ''suitable facilities for the detention and examination of all arriving aliens who it is suspected may be excludable under paragraphs (1) to (4) or (5) of section 1182(a) [of title 8].'' It would not be logical for Congress to have provided facilities suitable for the physical and mental examination of aliens suspected of being excludable under § 1182(a)(4), unless Congress assumed that the persons excludable under that paragraph are afflicted with diagnosable diseases. Congress considered homosexuality a disease. Not a word in the statute or its history suggests congressional intent that the Surgeon General be empowered in the future to eliminate homosexuality as a ground for exclusion by declaring his disagreement with Congress' determination that homosexuality is a ''mental defect or disease.''[4]

## II.   Amenability of Homosexuality to Diagnosis

In addition to promulgating a new policy regarding the medical status of homosexuality, the Surgeon General asserts in his memorandum: ''the determination of homosexuality is not made through a medical diagnostic

---

[4]We reject as a general proposition the suggestion in an October 16, 1979 letter to you from 18 Members of Congress that the INS, or any other agency, ''may make policy changes in light of changing facts and societal values without regard to court decision or legislative history.'' That position is flatly irreconcilable with the duty of the President, and of the executive branch he directs, to ''take Care that the Laws be faithfully executed.'' Constitution of the United States, Art. II, § 3, cl. 4.

This would be a different situation had Congress not given any specific content to its general medical categories or otherwise indicated its intent that the Surgeon General define the Act's provisions in light of changing medical opinion. For example, both the Members' letter and a memorandum by the National Gay Task Force, forwarded on July 11, 1979 by its Co-Executive Directors to former Associate Attorney General Michael J. Egan, note that the INS, under the Immigration Act of 1917, excluded at least one alien for contemplated adultery, *U.S. ex rel. Tourny* v. *Reimer,* 8 F. Supp. 91 (S.D.N.Y. 1934), and deported at least one for criminal ''lewdness,'' *Lane ex rel. Cronin* v. *Tillinghast,* 38 F.(2d) 231 (1st Cir. 1930). Both letters assert that the INS has since changed its policies in these areas, either under the 1917 Act or under the analogous provisions of the 1952 Act. However, the provisions involved—exclusion for intended acts of ''immoral purpose'' and deportation for crimes of ''moral turpitude''—were left wholly undefined by the 1917 Act and by its legislative history. *See* S. Rept. 352, 64th Cong., 1st sess. (1916). (The terms are also not explained in the legislative history of H.R. 6060, 63d Cong., 3d sess. (1916), in which the deportation category first appeared, or in the legislative history of the Act of February 20, 1907, 34 Stat. 898, 899, in which the exclusionary provision originated.) In these cases, INS could reasonably infer Congress' intent that it promulgate definitions and implement policies that reflect contemporary assessments of ''immoral purpose'' and ''moral turpitude.'' No such intended discretion appears from the history of § 1182(a)(4).

procedure." The meaning of this statement is ambiguous. If it is asserted that the ascertainment of homosexuality is not possible through medical diagnosis on the tautological ground that homosexuality is not a medical or pathological condition, this finding is merely a reassertion of the Surgeon General's first determination that homosexuality is not included in the statutory definition of "mental defect or disease." As stated above, this is a determination that the Surgeon General is not authorized to make. If the Surgeon General, however, has stated a fact of medical practice—namely, that doctors do not have available any procedure helpful in determining homosexuality—that fact, it appears, would not be subject to legislative alteration.[5] If this latter assertion is in fact the Surgeon General's determination, then it obviously would be unhelpful for the INS to refer suspected homosexuals to the PHS for mental examination. The accuracy of this position cannot be determined by this Office.

### III. Administrative Consequences

In light of the foregoing, it is necessary to determine the administrative consequences of the Surgeon General's memorandum for the enforcement of the Act. His memorandum states:

> The Immigration and Naturalization officials * * * will be advised * * * that in accord with this change they should no longer refer aliens suspected only of being homosexual to the PHS for certification of a mental disease or defect under 8 USC 1224.

---

[5]We are in no position to assess and we express no view on this possibility. We note, however, that Congress was already aware in 1951 of the limited helpfulness of medical diagnosis in ascertaining homosexuality. In a memorandum accompanying the May 15, 1951 letter from Acting Surgeon General J. Masur to Representative Francis E. Walter, the PHS explained:

> Sexual perverts—The language of the bill lists sexual perverts or homosexual persons as among those aliens to be excluded from admission to the United States. In some instances considerable difficulty may be encountered in substantiating a diagnosis of homosexuality or sexual perversion. In other instances where the action and behavior of the person is [sic] more obvious, as might be noted in the manner of dress (so-called transvestism or fetishism), the condition may be more easily substantiated. Ordinarily, a history of homosexuality must be obtained from the individual, which he may successfully cover up. Some psychological tests may be helpful in uncovering homosexuality of which the individual, himself, may be unaware. At the present time there are no reliable laboratory tests which would be helpful in making a diagnosis. The detection of persons with more obvious sexual perversion is relatively simple. Considerably more difficulty may be encountered in uncovering the homosexual person. Ordinarily, persons suffering from disturbances in sexuality are included within the classification of "psychopathic personality with pathologic sexuality." This classification will specify such types of pathologic behavior as homosexuality or sexual perversion which includes sexual sadism, fetishism, transvestism, pedophilia, etc. In those instances where the disturbance in sexuality may be difficult to uncover, a more obvious disturbance in personality may be encountered which would warrant a classification of psychopathic personality or mental defect.

Reprinted in, H. Rept. 1365, 82d Cong., 2d sess. 47 (1952). The Surgeon General, in his August 2, 1979 memorandum, does not explain how the facts of diagnostic procedure have changed since 1951.

We also note that, to enforce the (a)(4) exclusions, INS will presumably be required to promulgate some policy defining homosexuality and prescribing the appropriate investigation to be undertaken by INS officers. Such investigations—like medical diagnoses—will likely have to rely primarily, if not entirely, on the representations of the arriving aliens.

461

To the extent that the Surgeon General's statement purports to authorize PHS medical officers to decline referrals from INS officers, his memorandum is without authority. Section 1224 of title 8 provides that physical and mental examinations of arriving aliens are to be conducted "under such *administrative* regulations as the Attorney General may prescribe, and under *medical* regulations prepared by the Surgeon General of the United States Public Health Service." [Emphasis added.] The question whether INS may properly refer particular categories of aliens to the PHS for examination is an administrative, not a medical question. Viewed as a question of law, the issue must be decided by the Attorney General, whose "determination and ruling" with respect to "all questions of law [relating to immigration and naturalization] shall be controlling." 8 U.S.C. § 1103(a). On the other hand, if the Surgeon General's advice is based on the asserted fact that the PHS has no procedures that would be helpful to the INS in these cases, that advice raises the same issue of medical fact discussed above.

The legal issue posed is whether the INS is legally required to enforce the exclusion of homosexual aliens if PHS would no longer provide examinations and certifications to assist the INS in verifying this ground for exclusion. We think that the INS is required to do so.

The sole indication that Congress intended that all suspected "(a)(4)" aliens be examined by the PHS prior to exclusion arises by implication from the requirement of 8 U.S.C. § 1224:

> [M]edical officers shall be provided with suitable facilities for the detention and examination of all arriving aliens who it is suspected may be excludable under paragraphs (1) to (4) or (5) of section 1182(a) of [title 8].

A requirement of suitable facilities for the examination of all suspected "(a)(4)" aliens arguably implies Congress' intent that all such aliens receive physical and mental examinations.

The structure of the Act, however, as well as its legislative history, and contemporaneous administrative interpretation, support the conclusion that examinations are not required in all cases, and that the requirement of suitable facilities for the examination of all aliens in the specified categories refers only to those aliens who may be referred to the PHS and by the INS. First, it must be noted that the statute does not impose any express obligation on the INS to refer potentially excludable aliens to the PHS for examination. On the contrary, the only express referral obligation imposed on examining immigration officers with respect to aliens "who may not appear * * * to be clearly and beyond a doubt entitled to land," 8 U.S.C. § 1225(b), is that the officers detain such aliens "for further inquiry to be conducted by a special inquiry officer." *Id.* The conclusion that PHS referrals were intended to be subject to the reasonable discretion of immigration officers is buttressed by 8 U.S.C. § 1224, which provides that the PHS shall render its medical certifications "for the information of the immigration officers and the special inquiry officers."

Further, the exclusion provisions do not require a PHS certification as a basis for an (a)(4) exclusion. Examining immigration officers may require evidence seemingly ample to make a reasonable (a)(4) determination: sworn statements by aliens; the production of books, papers, and documents; and the testimony, under subpoena, of additional witnesses. 8 U.S.C. § 1225. Upon a referral by examining INS officers, a special inquiry officer must make a determination concerning the admissibility based on any evidence produced at the inquiry. 8 U.S.C. § 1226(a). The Act provides that a PHS certification that an alien is afflicted with a mental defect as specified in § 1182(a)(4) will be conclusive of that fact at any hearing before a special inquiry officer, 8 U.S.C. § 1226(d), but nowhere implies that the absence of such a certification has any necessary effect whatsoever.

In sum, we conclude that, although referrals to the PHS, in light of the Surgeon General's directive, currently appear to be unhelpful with respect to the determination whether particular aliens are excludable as homosexuals, the INS is required nonetheless to enforce the Act's exclusionary provisions.

The unavailability of the PHS in the enforcement process does pose obvious practical problems. The term "homosexuality" is highly imprecise, and Congress may not have intended the exclusion of every individual who could arguably be included under any definition of homosexuality. It may reasonably be inferred that Congress intended homosexuality to be defined in light of current knowledge and social mores.

Because immigration officers are not expert in analyzing the personalities of arriving aliens, we believe it would serve the interests of rational law enforcement for the INS to promulgate a uniform policy for investigating the suspected homosexuality of arriving aliens. Such a policy might indicate the extent to which examining officers are to rely on the representations of the aliens themselves and the particular questions, if any, that officers may ask concerning specific conduct.

Finally, in view of the Surgeon General's memorandum and the consequent law enforcement problems posed for the INS, we recommend that the memorandum, its consequences for the INS, and any resulting enforcement policy be brought to the attention of Congress.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*