## MATTER OF LAROCHELLE

In Deportation Proceedings

### A-7128195

*Decided by Board December 1, 1965*

(1) Existence of a pattern of homosexual activity over an extended period of time before and after respondent's entry in 1949 establishes that he was a homosexual at the time of that entry and since a homosexual comes within the meaning of the term "constitutional psychopathic inferiority" of section 3, Immigration Act of February 5, 1917, as amended, as it was interpreted at time of the above entry, respondent is deportable as an alien who was excludable at time of entry in 1949.

(2) In view of the favorable factors in respondent's case: his 20 years of residence in the United States, his war service, his steady employment, and his efforts to gain self-control; the unavailability of alternative relief; and the possibility he may be eligible for naturalization, action on the motion for termination of the proceedings to enable respondent to apply for naturalization will be held in abeyance pending a preliminary determination by the Service of his eligibility for naturalization.

CHARGES:

Order: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Excludable at entry—section 212(a)(4) [8 U.S.C. 1182(a)(4)] —afflicted with psychopathic personality.

Lodged: Act of 1952—Section 241(a)(1) [8 U.S.C. 1251(a)(1)]—Section 3, Act of February 5, 1917—afflicted with constitutional psychopathic inferiority.

This is an appeal from the special inquiry officer finding respondent deportable on the lodged charge and granting voluntary departure; we find the charge sustained. 

The Service charges that respondent, a 41-year-old single male alien, a native and citizen of Canada, admitted to the United States on February 7, 1949 with a permanent resident visa, was a person of constitutional psychopathic inferiority at the time of his entry. Respondent contends he was not excludable under the laws and regulations existing at the time of his entry. In the event he is

436

found deportable, he requests that proceedings be terminated to enabled him to apply for naturalization.

The history and facts are fully stated in previous orders. Briefly, after respondent's original admission for permanent residence, he visited Canada for short periods about every eighth week. Shortly after his last return on January 1, 1960, he was arrested in Michigan for soliciting for an immoral act; he was convicted, but upon a new trial was found not guilty. Following the arrest, respondent was questioned by the Service and examined by a United States Public Health Service psychiatric consultant. The Service instituted deportation proceedings on the ground that the respondent was a homosexual and had been excludable as a psychopathic personality at the time of his return in 1960. Ordered deported by a special inquiry officer, his appeal to this Board dismissed, respondent sought judicial review. On July 12, 1961, the court found respondent had been properly ordered deported (*LaRochelle* v. *Sahli*, E.D. Mich., Civ. No. 20435). Review was again sought; the court vacated the order of deportation and remanded the case to the Service for a determination under *Rosenberg* v. *Fleuti*, 374 U.S. 449 (1963), as to whether the respondent's return on January 1, 1960 constituted an "entry" for immigration purposes (*LaRochelle* v. *Sahli*, E.D. Mich., Civ. No. 20435 (November 13, 1963)). (If there were no "entry," respondent would not have been subject to the qualitative provisions of the law upon his return from Canada.)

At the reopened deportation hearing the special inquiry officer did not sustain the charge in the order to show cause: he found that the respondent's return to the United States had followed a casual visit to Canada and did not therefore constitute an "entry" for immigration purposes under *Fleuti*. A new charge was lodged which alleged that respondent was deportable because he had been excludable as a person of constitutional psychopathic inferiority at the time of his entry as an immigrant on February 7, 1949; the special inquiry officer sustained this charge: he found that respondent was a homosexual and that it was the purpose of the law to exclude homosexuals and sexual perverts as persons who were in the constitutional psychopathic inferior category.

We shall now consider issues raised by the lodged charge. Counsel contends the Service is estopped from considering whether the respondent was medically admissible in 1949 because his admission for permanent residence in 1949 after he had passed a Government medical examination prevented the Government from any medical attack on his eligibility to have entered then. It is pointed out that had the medical ground been pressed in exclusion proceedings, re-

spondent could have had a medical board act as the one to decide his application and that this right is lost in deportation proceedings. The contention is rejected. Congress indicated its intention to make deportable those who were medically inadmissible at the time of entry but who nevertheless succeeded in entering the United States; moreover, the deportation proceeding is the recognized forum for trying the issue (S. Rep. No. 1137, 82d Cong., 2d Sess. 21 (1952); see *Quirez* v. *Neelly*, 291 F.2d 906 (5th Cir., 1961); *U.S. ex rel. Leon* v. *Murff*, 250 F.2d 436 (2d Cir., 1957); *United States* v. *Holland-American Line*, 231 F.2d 373 (2d Cir., 1956); *Canciamilla* v. *Haff*, 64 F.2d 875 (9th Cir., 1933); *U.S. ex rel. Powlonnec* v. *Day*, 33 F.2d 267 (2d Cir., 1929), cert. den. 280 U.S. 594, followed *U.S. ex rel. Kressberg* v. *Day*, 37 F.2d 1014 (2d Cir., 1930); *Gee Shew Hong* v. *Nagle*, 18 F.2d 248, 249 (9th Cir., 1927) (dictum); *U.S. ex rel. Haft* v. *Tod*, 300 F. 917, S.D. N.Y., 1923, aff'd 300 F. 918 (2d Cir., 1924); *United States* v. *Schwarz*, 82 F. Supp. 933, S.D. N.Y., 1949; *Matter of R—*, 8 I. & N. Dec. 646; *Matter of A—*, 8 I. & N. Dec. 12; *Matter of P—*, 7 I. & N. Dec. 258; section 241(a), (d) and section 242(b) of the Act; cf. *Mannerfrid* v. *Brownell*, 238 F.2d 32 (D.C. Cir., 1956), affirming 145 F. Supp. 55 (D.C., 1956), cert. den. 352 U.S. 1017; *Lazarescu* v. *United States*, 199 F.2d 898 (4th Cir., 1952); *Matter of M—*, 4 I. &. N. Dec. 532).

Counsel's attack on the court cases on the ground that the jurisdiction of the Service to review medical eligibility of one admitted for permanent residence was not raised must be dismissed. A review of the law and cases reveals that Congress provided for the deportation of medically excludable aliens who had succeeded in entering the United States. Such deportation was the consistent administrative practice, and a court could have raised the question of jurisdiction on its own (a similar issue was discussed in *Matter of A—*, *supra*). No persuasive reason for abandoning the administrative practice has been advanced. Indeed, counsel recognized the fact that this practice was properly followed at the deportation hearing (pp. 137, 140).

The Service theory is that when respondent entered in 1949 the law required the exclusion of constitutional psychopathic inferiors, that a homosexual was in that category, and that the respondent having then been a homosexual was excludable as a constitutional psychopathic inferior. Counsel contends the record does not establish that the respondent was a homosexual. We find to the contrary. In 1960, when questioned under oath by a Service investigator, the respondent who was then 26 stated he had the homosexual habit for some ten or fifteen years, that drinking brought it out, that he

had engaged in both active and passive sex acts with men, that he had not engaged in such acts in Canada with anyone for the past ten years and, somewhat inconsistently and without explanation, that he had not engaged in such acts ten years ago. He admitted having committed a homosexual act within three or four weeks of the questioning (Ex. 4). The summary of a United States Public Health Service psychiatric consultant who examined the respondent in 1960 reveals that respondent stated to him that he became acquainted with homosexuality while serving in the Canadian Army during World War II, that his sexual experiences between 1942 and 1945 were largely with men, that his homosexual contacts since his army experience had become more frequent, that in the past five or six years previous to the questioning the respondent had accepted the fact that he was a homosexual and dependent upon homosexual acts for his sexual outlet, that in the same period his male partners had been found through contacts made in the public, that he had had sexual relations with women but preferred them with men (Ex. 2). Respondent reviewed the information in the summary at the reopened hearing and stated that he found no factual inaccuracies but that "they are vague" (p. 204). At the reopened hearing the Government expert witness testified that in his opinion based upon a review of his record of the respondent's examination in 1960 and the statement respondent made in 1960 (Ex. 4), respondent was a homosexual (pp. 135–175). The expert witness who appeared on respondent's behalf testified that respondent had gone to him for the three years from 1960 to 1963 for treatment of a homosexual condition, that he had reexamined respondent about two weeks before the hearing, and that he considered respondent was cured since he had engaged in no homosexual act since his treatment (pp.180–202). The witness pointed to respondent's good record with the Royal Air Force, his record of 15 years' responsible employment at one job, the fact that he supports his parents, and the facts that the sex incidents took place when respondent was under the influence of liquor and he was the passive partner. Respondent's answer as to why he had gone to his psychiatrist was "to get at the basic cause of the homosexuality, which was my problem; to see what could be done about it, if I could be remedied" (p. 205). The existence of a pattern of homosexual activity over an extended period of time before and after respondent's entry in 1949 establishes that he was a homosexual at the time of this entry.

Counsel contends that a homosexual is not a constitutional psychopathic inferior merely because he is a homosexual but that to establish that a homosexual is a constitutional psychopathic inferior, it

must also be proven that the condition is constitutional and had brought the person in repeated conflict with society and authority.

The congressional history of the 1917 Act reveals that the term "constitutional psychopathic inferiority" was added to the law to "make the list of excluded classes complete, especially with regard to the mentally deficient", that the change had "been made only after consultation with person of knowledge and experience", and that the object of the change was "to prevent the introduction into the country of strains of mental defectives that may continue and multiply through succeeding generation." (S. Rep. No. 355, 63rd Cong., 2d Sess. 5 (1914) ; S. Rep. No. 352, 64th Cong., 1st Sess. 4–5 (1916).)

The Public Health regulations are of assistance. The "Manual of the Mental Examination of Aliens" issued by the United States Public Health Service in 1918 (Washington Government Printing Office, Miscellaneous Publication No. 18, Treasury Department, United States Public Health Service) contains the following explanation under the heading "Constitutional Psychopathic Inferiority":

But aside from those showing defective intelligence, there is an important group in the borderland between sanity and insanity who are "failures of mental adaptation" and have a tendency to become actively disordered. In this class are the constitutional psychopaths and inferiors, the moral imbeciles, the pathological liars and swindlers, the defective delinquents, many of the vagrants and cranks, and persons with abnormal sexual instincts. The dividing line between these various types is not well defined, and for purposes of simplicity in classifying the mentally abnormal immigrant they may all be included in one general class and certified as cases of constitutional psychopathic inferiority.

A revision of the regulations defined persons of constitutional psychopathic inferiority as follows:

There shall be certified as cases of constitutional psychopathic inferiority all psychopathic characters such as "chronic litigants," "sexual perverts," "pathological liars," "dipsomaniacs," "moral imbeciles," and mentally peculiar persons who because of eccentric behavior, defective judgment, or abnormal impulses are in repeated conflict with social customs and constituted authorities. Well-marked cases of psychasthenia and hysteria that have developed on an unstable nervous constitution shall also be certified for constitutional psychopathic inferiority.

Supplementary instructions in the revision contained the following statement:

Constitutional Psychopathic Inferiority—The concept constitutional psychopathic inferiority embraces a variety of people of unusual temperament and uncontrolled antisocial impulses. These people may have subnormal, normal, or superior intelligence; they may appear to have a pleasing personality, but many of them have paranoid trends. (Regulations Governing the Medical Examina-

tion of Aliens, Revised August, 1930, Miscellaneous Publication No. 5, United States Treasury Department, Public Health Service, pp. 13, 45)

The history of the 1952 Act, an Act which incorporated section 3 of the 1917 Act, reveals that Congress desired the *continued* exclusion of the homosexual and considered this accomplished when it replaced the term "constitutional psychopathic inferiority" with the term "psychopathic personality"—a replacement made to permit use of current medical terminology; that the replacement was without other importance is shown by the fact that no one excludable as a psychopathic personality was mentioned in the discussion relating to *modifications* of or *additions* to the classes of excludable aliens. (See *Matter of P—*, 7 I. & N. Dec. 258; S. Rep. No. 1137, 82d Cong., 2d Sess. 8–12 (1952).) It thus appears that consistently from its inception the term "constitutional psychopathic inferiority" has been interpreted as applying to one with abnormal sexual instincts. Respondent by his own admission engaged in abnormal sexual acts over an extended period of time; such conduct was in conflict with social custom; he comes within the meaning of the term "constitutional psychopathic inferiority" as it was interpreted at the time of his entry, and he was then excludable.

It is no bar to our finding that the Government expert witness stated he could not certify that the respondent was a person of constitutional psychopathic inferiority in 1949. (The witness did state that respondent, on the basis of his social history, was a homosexual and a psychopathic personality.) First, in deportation proceedings we are not bound by the medical certificate and there is in this record adequate support for the conclusion that respondent was a person of constituitonal psychopathic inferiority at the time of entry. Second, the witness' inability to certify respondent as a person of constitutional psychopathic inferiority must be viewed in light of his explanation. The witness testified that he could not certify that anyone was a person of constitutional psychopathic inferiority, because this term was no longer used, it having been replaced by the term "psychopathic personality." He explained that the term "constitutional psychopathic inferiority" was abandoned because it carried with it the assumption that heredity was the factor giving rise to the abberrant behaviors whereas medical opinion cannot now say on the basis of the present level of medical knowledge that such behaviors are caused by hereditary (constitutional) factors rather than by environmental. Therefore, one exhibiting certain abberrant behavior is described as a "psychopathic personality," the term describing behavior without in the process of naming it, attempting to state the reason for the behavior.

441

The considerations which control the medical expert do not control us. In determining whether an alien is deportable we are not permitted to become involved with issues concerning the wisdom or correctness of congressional action: our task is to see if the respondent involved is in the class that Congress had in mind as the subject of its law; it appears to us on this record that respondent is such a person.

Counsel contends the term "constitutional psychopathic inferiority" is void for vagueness. We have no jurisdiction to consider the validity of an Act of Congress.

When the Service lodged the new charge alleging that respondent was excludable at the time of his original entry, counsel moved for termination of proceedings. The motion was denied. Counsel contends this denial was error. We find no error. Although the Service was apparently abandoning its original charge, it could in the same proceeding explore any charge it deemed applicable (8 CFR 246.16(d); see *Crane* v. *Boyd*, 237 F.2d 927 (9th Cir., 1956)). The alien cannot dictate to the Government the charge which will be used in his case (*Ntovas* v. *Ahrens*, 276 F.2d 483 (7th Cir., 1960), cert. den. 364 U.S. 826).

Counsel contends it was error to deny his motion to terminate proceedings for the purpose of allowing respondent to apply for naturalization. Counsel points to the fact that the case has been pending for five years, that it was not reopened until about a year after the court had remanded the case for further administrative proceedings, that respondent has twice undergone the expense of judicial review of the original charge which has now been abandoned, that during the pendency of deportation proceedings the respondent has been unable to visit close relatives in Canada and engage in family celebrations, that he has lived under the tension of legal insecurity during this time, that he is now compelled to await the outcome and expense of further administrative proceedings, and that the morals charge against him was dismissed after trial. He points to respondent's war service, his steady employment, his efforts to gain self-control, his 20 years of residence in the United States, and the effect his deportation could have on the United States citizen employer for whom he manages a pattern and model works. The Service stating that termination of proceedings to permit naturalization is an extraordinary relief opposes such termination on the ground that the legality of his entry is in issue, and the respondent's record as a homosexual raises a question as to whether the court would naturalize him.

Further exploration of the request for termination of proceedings to enable respondent to apply for naturalization is indicated by the existence of the favorable factors, the lack of alternative relief, and the possibility that respondent is not ineligible for naturalization (see *United States* v. *Schwarz*, 82 F. Supp. 933, S.D. N.Y. (1949)).

So that we may rule upon the request for termination on the basis of a record which is more adequate than the one before us, we shall reopen proceedings to enable respondent to submit to the Service an application to file a petition for naturalization, and to enable the Service to process the application and make such recommendation as to matters of law and discretion as is deemed appropriate; the case shall then be returned to the Board with such briefs as the parties may desire to file. We shall then pass upon the motion for termination of proceedings (see *Pignatello* v. *Attorney General of United States*, 350 F.2d 719 (2d Cir. 1965); *Matter of Hroncich*, Int. Dec. No. 1473). Our action here should not be construed as an expression of opinion as to respondent's eligibility for naturalization or the desirability of granting his application.

**ORDER:** It is ordered that action on the motion be held in abeyance pending the outcome of the preliminary proceedings on the alien's application to file petition for naturalization.