.Carl Basil Angelo HILL,
Petitioner-Appellee,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, et al.,
Respondents-Appellants.

LESBIAN/GAY FREEDOM DAY COMMITTEE, INC., et al.,
Plaintiffs-Appellees,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, et al.,
Defendants-Appellants.

Nos. 82–4366, 82–4423.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 12, 1983.

Decided Sept. 7, 1983.

James Hunolt, Washington, D.C., for petitioner-appellee.

Jeff T. Appleman, Mary C. Dunlap, San Francisco, Cal., Laurence R. Sperber, Los Angeles, Cal., for respondents-appellants.

Before ELY, Senior Circuit Judge, and SCHROEDER and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

This appeal presents the issue whether Congress intended to require the Immigration and Naturalization Service to obtain a Public Health Service medical certificate

before excluding self-declared homosexuals from the United States on the ground of affliction with a psychopathic personality, sexual deviation, or mental defect. We conclude that Congress did so intend. As a result, we hold that the possibility that the Lesbian/Gay Freedom Day organization and its officers will be denied their first amendment rights of free speech and association with homosexual aliens is too speculative to constitute a case or controversy.

### I.

### *Hill v. INS*

#### A. BACKGROUND

The Immigration and Nationality Act provides that certain classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States. 8 U.S.C. § 1182(a) (1976). The first seven sub-paragraphs of section 1182(a) describe excludable mental and physical disabilities including affliction "with psychopathic personality, or sexual deviation, or a mental defect". 8 U.S.C. § 1182(a)(4). The predecessor of this subsection has been interpreted to include homosexuals. *Boutilier v. Immigration and Naturalization Service*, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967).[1]

Congress has plenary power over immigration, *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977), and it is not for us to judge the wisdom of its

decision to exclude homosexuals. Our issue is different: whether Congress created a procedure requiring a medical examination and certificate of diagnosis before an alien may be excluded because of psychopathic personality, sexual deviation, or mental defect.

Prior to 1979, the Immigration and Naturalization Service ("INS") would refer individuals seeking entry to the United States who were suspected of being homosexual to an officer of the Public Health Service ("PHS") for a medical examination, just as it would process any applicant suspected of mental or physical defect. If the PHS official concluded that the applicant was homosexual, the official would certify these findings in a "Class A certificate" to the INS officer.[2] 8 U.S.C. § 1224 (1976 & Supp. V 1981). This certificate constitutes the evidentiary basis for exclusion. 8 U.S.C. § 1226 (1976).

On August 2, 1979 the Surgeon General of the United States announced a new policy for the Public Health Service. As part of this policy, PHS personnel were ordered not to issue medical certificates solely because an alien is suspected of being homosexual. The old policy was revised for two reasons. First, according to "current and generally accepted canons of medical practice", homosexuality *per se* is no longer considered to be a mental disorder.[3]

---

**1.** *Boutilier* concerned 8 U.S.C. § 1182(a)(4) as originally enacted, which excluded "Aliens afflicted with psychopathic personality, epilepsy or a mental defect". The Court found that the "legislative history of the Act indicates beyond a shadow of a doubt that the Congress intended the phrase 'psychopathic personality' to include homosexuals". 387 U.S. at 120, 87 S.Ct. at 1565. Earlier, the Ninth Circuit in *Fleuti v. Rosenberg*, 302 F.2d 652 (9th Cir.1962), *vacated on other grounds*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), had held that "psychopathic personality" was too vague to encompass homosexuals under certain circumstances. In response, in 1965 Congress amended section 1182(a)(4) to include the words "sexual deviate" in order to "serve the purpose of resolving any doubt on this point." S.Rep. No. 748, 89th Cong., 1st Sess. 19, reprinted in 1965 U.S.Code Cong. & Ad.News 3328, 3337; H.R.Rep. No. 745, 89th Cong., 1st Sess. 16 (1965). Counsel

argues that Congress intended the meaning of the terms "psychopathic personality, sexual deviation, or a mental defect" to depend on prevailing medical opinion, and that the current opinion is that homosexuals, *per se*, do not come within the definition of the terms. In view of our decision on the narrower issue of the necessity of a medical certificate we do not reach this issue.

**2.** There are three kinds of medical certificates. A Class A certificate indicates a definite as opposed to inconclusive diagnosis. 1A C. Gordon & H. Rosenfield, *Immigration Law and Procedure* §§ 3.15b, 3.15c (Rev. ed. 1982); 42 C.F.R. § 34.7 (1983).

**3.** In making this determination, the Surgeon General placed great weight on the fact that, according to the comprehensive listing of currently recognized psychiatric diagnoses in the

Second, "the determination of homosexuality is not made through a medical diagnostic procedure." 56 Interpreter Releases 387, 398 (1979).

In response, the INS initially allowed suspected homosexuals to enter the country conditionally under parole status, see 8 U.S.C. § 1182(d)(5) (1976 and Supp. V 1981), deferring their medical examinations pending resolution of this dispute with the PHS. N.Y. Times, Aug. 15, 1979, at A14, col. 1. The Assistant Attorney General, Office of Legal Counsel of the Department of Justice, acknowledged that the Immigration and Nationality Act (the "Act")[4] granted the Surgeon General "discretion to promulgate policies regarding the description and diagnosis of disease," but found that this discretion was limited by Congress' specific intent to bar homosexuals, and suggested that the INS promulgate a uniform policy for investigating suspected homosexuals. 56 Interpreter Releases 569, 572 (1979).

On September 9, 1980, the INS adopted "Guidelines and Procedures for the Inspection of Aliens Who Are Suspected of Being Homosexual", which provide that an arriving alien will not be asked any questions regarding his or her sexual preference. If an alien "makes an unambiguous oral or written admission of homosexuality" or if a third person who is also presenting himself or herself for inspection "voluntarily states, without prompting or prior questioning, that an alien who arrived in the United States at the same time . . . is a homosexual," the alien may be examined privately by an immigration official and asked to sign a statement declaring he or she is homosexual. A hearing is held before an Immigration Judge and the alien is excluded based

on his admissions. No medical certificate is obtained under the new guidelines. 57 Interpreter Releases 440 (1980).

On November 5, 1980, Carl Hill, a subject of the United Kingdom of Great Britain, presented himself as a nonimmigrant visitor for pleasure at San Francisco International Airport. He possessed a valid visitor's visa. Hill made an unsolicited statement to the immigration inspector that he was a homosexual. The inspector then issued Hill a form notifying him that he appeared to be excludable under 28 U.S.C. § 1182(a)(4) (1976).

At the exclusion hearing, Hill again stated he was homosexual and acknowledged his earlier statement to the INS officer. The immigration judge held that Hill could not be excluded from the United States because, despite Hill's statements, the INS had no medical certification that Hill was afflicted with a sexual deviation or mental defect, as was statutorily required.

The INS appealed to the Board of Immigration Appeals, which held that a medical certificate is not required to exclude a self-declared homosexual because such a person fails to carry the burden of establishing that he or she is admissible to the United States. *In re Hill,* 18 I & N No. 2873 (1981).

Hill petitioned the district court for a writ of habeas corpus. The district court granted the writ, finding that the exclusion of an alien for affliction with a sexual deviation or mental disorder must be based on a medical certificate. The court permitted the INS thirty days in which to institute new exclusion proceedings. When no new proceedings were instituted, Hill was admitted into the United States as a visitor

1974 revised edition and the 1979 edition of the Diagnostic and Statistical Manual of Mental Disorders published by the American Psychiatric Association, homosexuality is not considered to be a psychiatric disorder. The Surgeon General was also influenced by the fact that the American Psychiatric Association's position had been officially endorsed by the American Psychological Association, the American Public Health Association, the American Nurses' Association, and the Council of Advanced Practitioners in Psychiatric and Mental Health Nursing of the American Nurses' Asso-

ciation. The PHS has traditionally relied on these organizations for their "professional expertise . . . [and] for advice and information on a wide variety of physical and mental health issues." 56 Interpreter Releases 387, 398 (1979).

4. Ch. 477, 66 Stat. 163 (1952) (codified at 8 U.S.C. §§ 1101–1503 (1976 & Supp. V 1981) and in scattered sections of 18, 22, 31, 49, 50 App. U.S.C.).

for pleasure. *Lesbian/Gay Freedom Committee, Inc. v. United States Immigration and Naturalization Service,* 541 F.Supp. 569 (N.D.Cal.1982). The government now brings this appeal.

## B. DISCUSSION

In the district court, the Government contended that the case had become moot because Hill has left the country. The court held that the "capable of repetition, yet evading review" exception to the mootness doctrine applied. 541 F.Supp. at 576–77. The Government has not challenged this ruling on appeal. We find no reason to rule *sua sponte* that the trial court was in error on this point.

The issue presented is whether the INS may exclude self-declared homosexual aliens without medical certification of psychopathic personality, sexual deviation, or mental defect. We conclude that it may not.[5] We base our conclusion on the language and structure of the Act, indications of congressional intent in the legislative history, the INS' longstanding and consistent interpretation of the Act, and prior judicial decisions construing the Act.

### 1. The Language and Structure of the Act

We look first to the text of the Act for "[t]he starting point in every case involving construction of a statute is the language itself." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976) (citations omitted) (construing § 10(b) of Securities Exchange Act of 1934).

The Act does not explicitly state that a medical certificate is required for exclusion under 8 U.S.C. § 1182(a)(4). The language and structure of the Act, however, make it clear that such was the intent of Congress.

■ The first relevant section in 8 U.S.C. § 1222, which provides in part,

For the purpose of determining whether aliens (including alien crewmen) arriving at ports of the United States belong to any of the classes excluded by this chapter, by reason of being afflicted with any of the diseases or mental or physical defects or disabilities set forth in section 1182(a) of this title . . ., such aliens *shall be detained* . . ., for a sufficient time to enable the immigration officers and medical officers to subject such aliens to *observation and an examination sufficient to determine whether or not they belong to the excluded classes.*

8 U.S.C. § 1222 (1976) (emphasis added). Congress' proviso that aliens suspected of affliction with mental disability "shall be detained" before entering the country to allow for observation and examination is convincing evidence that Congress intended that such examinations take place and be a prerequisite to exclusion on such grounds.

■ The next relevant section is 8 U.S.C. § 1224, which provides in part,

The physical and mental examination of arriving aliens (including alien crewmen) *shall* be made by medical officers of the United States Public Health Service, who shall conduct *all* medical examinations and *shall certify,* for the information of the immigration officers and the special inquiry officers, any physical and mental defect or disease observed by such medical officers in any such alien. . . . Medical officers of the United States Public Health Service who have had *special training in the diagnosis of insanity and mental defects* shall be detailed for duty or employed at such ports of entry as the Attorney General may designate, and such medical officers shall be provided with suitable facilities for the deten-

---

5. Commentators writing both before and after the PHS' refusal to issue medical certificates on the basis of homosexuality *per se* agree with our conclusion. E. Harper & R. Chase, *Immigration Laws of the United States* § 2(a), at 374 (1975) ("A determination of ineligibility to receive a visa for one of the grounds listed under subdivisions (1) through (6) of this subsection [8 U.S.C. § 1182(a)] must be based on the finding of a competent medical examiner."); Note, *The Immigration and Nationality Act and the Exclusion of Homosexuals:* Boutilier v. INS *Revisited,* 2 Cardozo L.Rev. 359, 370 & n. 72 (1981) ("the medical examination and certificate are indispensable prequisites to a proper exclusion on any medical ground").

tion and examination of all arriving aliens who it is suspected may be excludable under paragraphs (1) to (4) or (5) of section 1182(a) of this title . . .

8 U.S.C. § 1224 (1976 & Supp. V 1981) (emphasis added). It is a well-established rule of statutory construction that use of the word "shall" denotes a mandatory requirement. *E.g., United States v. Machado,* 306 F.Supp. 995, 997 (N.D.Cal.1969); *cf. United States v. Reeb,* 433 F.2d 381, 383 (9th Cir.1970), *cert. denied,* 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1970) ("shall" usually denotes imperative, but court may consider background circumstances, context of statute, and intent of Congress). The section thus contemplates that aliens sought to be excluded under 8 U.S.C. § 1182(a)(4) will be given a medical examination. Moreover, the section requires that medical officers conduct all medical examinations. It would thus violate Congress' direction to allow INS officers who are not medically trained to determine psychopathic personality, sexual deviation, or mental defect by interrogation. *See also* 42 U.S.C. § 252 (1976). That Congress intended the determination to be made solely by trained physicians is borne out by the last sentence of section 1224, which allows for an appeal of a medical determination of excludability under 8 U.S.C. § 1182(a)(4) to a board of medical officers of the PHS to be convened by the Surgeon General.

Congress made its intent to require a medical examination even clearer in section 1226(d), which provides in part,

> If a medical officer or civil surgeon or board of medical officers has certified under section 1224 of this title that an alien is afflicted with a disease specified in section 1182(a)(6) of this title, or with any mental disease, defect, or disability which would bring such alien within any of the classes excluded from admission to the United States under paragraphs (1) to (4) or (5) of section 1182(a) of this title, the decision of the special inquiry officer shall be based *solely* upon such certification.

8 U.S.C. § 1226(d) (1976) (emphasis added). The provision that a decision to exclude be based *solely* on the medical certificate must be considered with the prior sections mandating physical and mental examinations by public health doctors, and the omission of any other means of determining this type of excludability. A strong implication arises that the certificate is a prerequisite to exclusion. The sections imply that other evidence such as admissions made to an immigration officer should not be considered. *See United States ex rel. Wulf v. Esperdy,* 277 F.2d 537 (2d Cir.1960) (per curiam).

■ The final relevant section is 8 U.S.C. § 1225(a), which states,

> The inspection, *other than the physical and mental examination,* of aliens (including alien crewmen) seeking admission or readmission to or the privilege of passing through the United States shall be conducted by immigration officers, except as otherwise provided in regard to special inquiry officers.

8 U.S.C. § 1225(a) (1976) (emphasis added). The import of this section is that immigration officers are not to perform physical and mental examinations by obtaining admissions; doctors are to perform the mental and physical examinations.

It is argued that each of these sections, standing alone, leaves some ambiguity about whether a medical examination and certificate are required. Nevertheless, these sections viewed as a whole clearly indicate a congressional intent to set up a procedure for medical examinations and medical certificates prior to exclusion on mental or physical grounds. While "the language of a statute controls when sufficiently clear in its context," *Ernst & Ernst v. Hochfelder,* 425 U.S. at 201, 96 S.Ct. at 1385 (citations omitted), we turn next to the legislative history, which corroborates our reading of the statute.

## 2. The Legislative History

The legislative history of the Act reinforces our opinion that a medical certificate is required for exclusion as a psychopathic personality or sexual deviate.

The House Report on the 1952 Act referred to exclusion under 8 U.S.C. § 1182(a)(4) as one of "the medical grounds for exclusion".[6]  H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1698.  Similarly, the report of the Public Health Service on the pending legislation, the recommendations of which the House specifically adopted, *id.* at 1702; *Boutilier v. Immigration and Naturalization Service*, 387 U.S. 118, 122, 87 S.Ct. 1563, 1566, 18 L.Ed.2d 661 (1967), refers to the exclusion under section 1182(a)(4) as one of "the classes subject to *determination* on medical grounds."  Report of the Public Health Service on the Medical Aspects of H.R. 2379, A Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality, and for Other Purposes, *reprinted in* H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1699 (emphasis added).  The PHS' recommendation that "conditions related to the field of mental disorders and subject to medical determination, be grouped together, and that item 5 of section 212(a) [8 U.S.C. § 1182(a)], relating to paupers, etc., be placed in the group not subject to medical determination", *id.* at 1700, was adopted.[7]  This makes clear the organization of section 1182 into two categories, medically determined exclusions and nonmedically determined exclusions.

The PHS report elaborated on the point that homosexuality was to be medically determined.  The report referred to "the diagnosis of homosexuality", and mentioned the utility of "psychological tests [which] may be helpful in uncovering homosexuality of which the individual, himself, may be unaware".  *Id.* at 1701.  These comments are important for two reasons.  First they show that Congress and the PHS thought, at the time of the adoption of the Act, that homosexuality was diagnosable, and that a medical determination would be made.  Accordingly, there is no indication in the legislative history that Congress or the PHS believed that homosexuality should be determined by admissions any more than schizophrenia could be self-diagnosed.  Second, the latter comment demonstrates the PHS' and Congress' understanding that homosexuals who are unaware themselves of their homosexuality would be excluded.  This understanding conflicts with a procedure that depends on homosexuals' admission of homosexuality rather than medical observation and determination.

The PHS report concluded by discussing the procedure for exclusion for physical defect, disease, or disability which affects the ability of the alien to earn a living.[8]  Such a determination is a two part process.  The medical officer determines "the extent to which a person is incapacitated or handicapped, leaving it to [the consular or immigration officer] to determine whether or not the person would be able to earn a living."  *Id.* at 1702.  This is the only mention of a joint medical-nonmedical determination of excludability, and is impliedly contrasted with other determinations which will be made either by medical officers on medical grounds or by nonmedical officers on nonmedical grounds.  "The medical officer does not make this [nonmedical] determination [of ability to earn a living], because of the socio-economic factors involved."  *Id.*

■ The House Report further discussed the procedures for exclusion.

> Every alien arriving at a port of entry must be examined by an immigration officer before he may enter, and such officers are empowered to detain the aliens

---

**6.** That Congress referred to the exclusion for psychopathic personality as one on medical grounds does not conflict with *Boutilier's* finding that Congress did not intend to use the term in its clinical sense.  See 387 U.S. at 124, 87 S.Ct. at 1567.  By analogy, the legal definition of "insanity" differs from the medical one (if in fact a doctor would use the term at all), yet doctors' examinations are used to determine legal insanity.

**7.** In the bill as adopted, the exclusion for "paupers, professional beggars, or vagrants" was made the eighth category of exclusions, 8 U.S.C. § 1182(a)(8) (1976), falling after the medical, 8 U.S.C. § 1182(a)(1)–(6) (1976), and joint medical-nonmedical, 8 U.S.C. § 1182(a)(7) (1976), categories.

**8.** *See* 8 U.S.C. § 1182(a)(7) (1976).

on board the arriving vessel or at the airport of arrival for observation if suspected of being afflicted with mental or physical defects and may order the temporary removal of the alien for examination and inspection. Medical examinations are to be made by at least one qualified medical officer of the United States Public Health Service or by a qualified civil surgeon.

H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.Code Cong. & Ad.News 1653, 1709. The procedure is explicit. If the immigration officer suspects an alien of having an excludable mental or physical affliction, the officer is empowered to detain the alien and order an examination and inspection. The officer is not empowered to take admissions or conduct inquiries concerning the affliction. Rather, the medical examination is to be made by "at least one qualified medical officer". *Id.*

Finally, both the House and Senate Reports state in terms similar to 8 U.S.C. § 1226(d), discussed above, that where a medical officer certifies that an alien is afflicted with an excludable mental or physical affliction, the special inquiry officer "must base his decision *solely* upon such certification and there is no right of appeal from an excluding decision." *Id.* at 1711; S.Rep. No. 1137, 82d Cong., 2d Sess. 45 (1952).

We find the legislative history persuasive on the point that a medical examination and certificate is required for exclusion on medical grounds.

### 3. Administrative Interpretation

In interpreting a statute, courts show great respect for the construction given by the officers or agency charged with its administration. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). *See also Adams v. Howerton*, 673 F.2d 1036, 1040 (9th Cir.), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982) (INS interpretation of 8 U.S.C. § 1151(b) of the Act). This is particularly true when the administration of the statute involves a contemporaneous construction of the law. *Udall v. Tallman*, 380 U.S. at 16, 85 S.Ct. at 801. Since the adoption of the 1952 Act and continuing consistently up until the INS' recent change of heart, it has required a medical examination and certificate for exclusion on medical grounds.[9]

The INS has consistently required medical certification because it does not consider itself competent or authorized to make medical determinations. For example, in *In re Caydam*, 12 I & N Dec. 528 (1967), the Board of Immigration Appeals reversed a deportation order because the underlying Class A certificate was defective. The Board stated,

> However, as neither the special inquiry officer nor this Board has the expertise or the authority to make a determination on respondent's medical admissibility or inadmissibility in these proceedings, we will remand this case with the direction that respondent be afforded the opportunity for a new and proper medical examination, conducted in accordance with the standards set forth therefore by the Surgeon General of the United States ...

12 I & N Dec. at 533.

The General Counsel for the INS, David Crosland, has reached the same conclusion

---

**9.** *E.g., In re Hayes*, No. A–12402065-Boston (March 13, 1968) (certification issued without strict compliance with Surgeon General's regulations not sufficient basis for exclusion despite admission of homosexual behavior and psychiatric testimony before special inquiry officer); *In re Caydam*, 12 I. & N. Dec. 528 (1967) (BIA reverses deportation order because Class A certificate defective; BIA lacks authority and expertise to make medical determinations); *In re Berger*, No. A–10379108-New York (July 12, 1967) (certification, without examination, based upon admission of homosexual acts and two convictions for homosexual acts held not sufficient to establish that alien was afflicted with proscribed condition); *In re Flight*, No. A–12944125 (September 8, 1965) (admission and description of five homosexual acts insufficient absent certification). *See also In re Hernandez-Gutierrez*, No. A–12633815 (July 29, 1964). *But see In re LaRochelle*, 11 I. & N. Dec. 436 (1965) (PHS doctor found alien was homosexual, but refused to certify him as having constitutional psychopathic inferiority; medical certificate not necessary in deportation, as opposed to exclusion, hearing).

that INS practice requires medical certification. In a memorandum to the Commissioner of the INS, he stated,

> Moreover it appears to us that every alien who is suspected of being a homosexual, and certainly this would include an individual who makes such a declaration [of being homosexual] to an immigration officer, must be referred to a medical officer of the Public Health Service before he may be excluded on that ground.

C.O. 212.3–C, 212.25–C.[10]

Finally, we note that the INS has deferred to the Public Health Service to prescribe the manner of conducting the physical and medical examinations of aliens, manifesting INS' understanding that this is a medical matter outside its expertise. 8 C.F.R. § 234.1 (1983); *see* 42 C.F.R. §§ 34.-1–34.14 (1982).

*4. Judicial Interpretation*

The courts have consistently interpreted the Act as setting up procedures for medical examination and certification that must be complied with.

The most significant decision is *United States ex rel. Johnson v. Shaughnessy,* 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054 (1949). The court of appeals held that a certificate of medical disability was final and binding on the INS and must result in an exclusion. *United States ex rel. Johnson v. Watkins,* 170 F.2d 1009, 1011–13 (2d Cir.1948), *rev'd on other grounds sub nom. United States ex rel. Johnson v. Shaughnessy,* 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054 (1949). The court of appeals relied on the legislative history, which stated that "on medical questions the opinions of doctors as against that of laymen should prevail. Of course practical questions should be determined by the immigration officials, but questions of purely medical nature must be determined by members of the medical profession." *Id.* at 1012 (quoting S.Rep. No. 352, 64th Cong., 1st Sess. (1917)). The Supreme Court

reached the same conclusion by construing the statute, section 17 of the 1917 Act, which corresponds to 8 U.S.C. § 1226(d) of the current Act.

The Court held that an alien could not be excluded for mental defect without a valid medical examination, construing section 16 of the 1917 Act, which is substantially identical to 8 U.S.C. § 1224 of the current Act, as making the medical examination and certificate a vital part of the exclusion process.

> The importance of these medical certificates is underscored by our holding that Congress has made the findings and conclusions in the certificates final on the question of whether an alien is so mentally defective that admission into the country must be denied. Congress has taken note of the crucial importance of this medical determination by prescribing certain minimum procedural requirements that the Public Health Service must follow, such as special qualifications of examining doctors, the minimum number of doctors that must examine the applying alien, and the right of an alien to have an initial adverse certificate reviewed by a special board of doctors. In order that further safeguards might be provided, Congress authorized the Surgeon General of the Public Health Service to prescribe additional regulations [continued by 8 U.S.C. § 1224 of the current Act] governing the procedure to be observed in the exercise of that Service's *exclusive authority over medical questions*
>
> . . . .
>
> Congress has provided that *before* aliens suspected of mental defects are excluded, findings and conclusions shall be made by Public Health doctors *based on their own examinations* made in compliance with procedural safeguards defined or authorized by Congress.

336 U.S. at 809–10, 814, 69 S.Ct. at 922–23, 925 (emphasis added).

---

**10.** *But see* Memorandum from Assistant Attorney General, Office of Legal Counsel of the Department of Justice, to the Acting Commissioner of the INS, 56 Interpreter Releases 569, 572 (1979).

A possibly distinguishing factor is that section 3 of the 1917 Act specifically excluded persons "who are found to be *and are certified by the examining surgeon* as being mentally . . . defective." Ch. 29, 39 Stat. 874 (1917) (emphasis added). This was not, however, the basis of the Court's decision. The motivating factor behind the Court's decision was Congress' intent that medical officers perform a meaningful examination of aliens. The Court found this intent on the face of section 16 of the 1917 Act, the provisions of which have been continued in 8 U.S.C. § 1224 of the current Act.

To the same effect is *United States ex rel. Saclarides v. Shaughnessy*, 180 F.2d 687 (2d Cir.1950), involving an alien the INS sought to exclude for a mental defect, mongolism. The Second Circuit reaffirmed its earlier holding in *Johnson* that "the only evidence of mental defect upon which a Board of Special Inquiry could act [to exclude] was a medical certificate lawfully issued." *Id.* at 688. Again, the court relied on section 16 of the 1917 Act, not section 3.

We also find some support for our view in the court of appeals decision in *Boutilier v. Immigration and Naturalization Service*, 363 F.2d 488, 492 (2d Cir.1966), *aff'd*, 387 U.S. 118, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967). Boutilier entered the country in 1955 as a permanent resident alien. In 1964 the government sought to deport Boutilier as being excludable for affliction with a psychopathic personality. The PHS issued a medical certificate based on a sworn written statement by Boutilier describing his homosexual experiences. The PHS doctors did not actually examine Boutilier. Boutilier contended that he could not be deported on this basis because he could not be excluded without such an examination. 363 F.2d at 492. The court disagreed, based on the differences in procedure between a deportation and an exclusion. *Id.* The court did, however, indicate that an actual medical examination rather than reliance on the alien's admissions would be needed for exclusion.

Boutilier now urges that an actual medical examination by the Public Health Service was an indispensable prerequisite to its opinion that he was afflicted with a "psychopathic personality." In support of this position, Boutilier relies on section 234 of the Act, 8 U.S.C. § 1224 . . . . See also 42 C.F.R. § 34.1. Boutilier urges that if an exclusion proceeding is to be valid, adherence to these procedures is required. See *United States ex rel. Johnson v. Shaughnessy*, 336 U.S. 806, 69 S.Ct. 921, 93 L.Ed. 1054 (1949).

.    .    .    .    .

Thus, section 234 and the cases and regulations which Boutilier cites . . . describe requirements which are applicable solely to exclusion proceedings.

*Id.* (footnote omitted).

*United States ex rel. Wulf v. Esperdy*, 277 F.2d 537 (2d Cir.1960), corroborates our understanding that exclusion must be based on a medical certification, not the alien's admissions. When applying in Peru for an immigrant visa the alien stated, "I am or have been afflicted with tuberculosis." *Id.* at 538. When the alien arrived in the United States she was examined by doctors of the PHS and a Class A medical certificate was issued. The alien sought to introduce expert medical testimony rebutting the diagnosis of tuberculosis. In affirming the order of exclusion, the court of appeals relied solely on the medical certificate.

The words of the statute do not support the construction which appellant urges. Section 236(d) states that "the decision of the special inquiry officer shall be based solely upon such certification." "Solely" means "exclusively," the "only one." The apparent purpose of Congress in using this language was to provide a summary procedure when persons certified as having contagious diseases were involved.

*Id.* at 538.

■ Despite the express language of the opinion that the medical certificate is the *only* acceptable basis for a decision to exclude, the government contends that *Wulf* should be given a limited reading so as only to preclude the introduction of evidence *contradictory* to the medical certificate. It

argues that evidence supporting the decision to exclude may be relied on. This contention is refuted by *In re Hollinger,* 211 F.Supp. 203 (E.D.Mich.1962). In 1958–1959 Hollinger had voluntarily sought treatment at a private hospital for a condition diagnosed as "schizophrenic reaction, paranoid type." 211 F.Supp. at 206. In 1960 she reentered the country after a brief visit to Canada. Subsequently, she petitioned for naturalization. The INS denied the petition for naturalization on the ground that Hollinger was excludable as insane when she reentered the United States. The INS did not obtain a medical certificate, instead relying solely on a letter from Hollinger's doctor. The court held this evidence insufficient:

> The *only* evidence upon which a finding of insanity can be made for the purpose of an exclusion proceeding is a certification under 8 U.S.C. § 1224 by a medical officer of the United States Public Health Service, or specially designated civil surgeons, or a board of Public Health Service officers. When excludability by reason of mental illness is asserted as a basis for refusing citizenship to an otherwise qualified applicant, the court should not accept less than *the law requires in an exclusion proceeding.*

*Id.* at 206 (emphasis added).

We find this case persuasive. Although reliable medical evidence existed of Hollinger's insanity, the court found the evidence insufficient. The reasons for adhering to the Act's requirements of a medical examination and certification of the results are even stronger where the evidence relied upon is the medically untrained alien's opinion of himself.

■ In sum, we find Congress' intent to require a medical examination and certification of all aliens excluded on medical grounds apparent on the face of the statute, corroborated by the legislative history, and supported by an unbroken string of administrative and judicial decisions.[11] The judgment of the district court in appeal no. 82–4366 is affirmed.

## II.

### *Lesbian/Gay Freedom Day Committee, Inc. v. INS*

#### A. BACKGROUND

The Lesbian/Gay Freedom Day Committee, Inc. ("the Committee") and its officers coordinate an annual event, held in San Francisco, to promote the rights of homosexuals. Lesbians and gay men from throughout the world are invited to attend the event and to participate by reporting the social and political positions of homosexuals in their countries. Homosexual aliens have appeared as speakers at past events.

The Committee and several of its officers brought this action against the INS and the Attorney General for declaratory and in-

---

**11.** Our decision in *Lavoie v. Immigration and Naturalization Service,* 418 F.2d 732 (9th Cir. 1969), *cert. denied,* 400 U.S. 854, 91 S.Ct. 72, 27 L.Ed.2d 92 (1970) is not contrary. The INS ordered Lavoie deported based upon his statement that he had frequently and regularly engaged in homosexual acts and on the conflicting testimony of two psychiatrists. The decision does not clearly state that a PHS doctor rendered a medical certificate. The Board of Immigration Appeals decision, *In re Lavoie,* 11 I. & N. Dec. 224 (1965) clarifies the issue by stating,

> Doctor Beittel, a staff psychiatrist of the United States *Public Health Services,* stated that the respondent had been a sexual deviate at least since 1946 and *certified* that the respondent was a sexual deviate in January of 1960 at least up to the time of his arrest, based upon an interview of approximately 60 minutes, . . .

*Id.* at 225 (emphasis added). Thus, there was a certification by a PHS doctor in *Lavoie.*

Nor is *Quiroz v. Neelly,* 291 F.2d 906 (5th Cir.1961), to the contrary. Quiroz, a native of Mexico, was deported from the United States as being afflicted with a psychopathic personality. Quiroz offered testimony from two doctors that although she was homosexual, she was not necessarily afflicted with a psychopathic personality as the term is used in the medical profession. This court held, as the Supreme Court later held in *Boutilier,* that Congress had used "psychopathic personality" as a legal term of art encompassing homosexuality, not as a clinical term. The opinion does not say that no medical certificate was presented. 291 F.2d at 907. The opinion merely states; "[t]he evidence established that the appellant is a homosexual". *Id.* We have no reason to assume that a PHS certificate was not obtained.

junctive relief against violations of their first amendment rights to free speech and association.[12] The Committee and its officers claim that the INS' policy of excluding homosexual aliens without a medical certificate deprives the plaintiffs of their rights to communicate and associate with homosexual aliens in connection with the Lesbian/Gay Freedom Day events.

The district court denied the plaintiffs' motion for a temporary restraining order for lack of a sufficient evidentiary showing, but subsequently granted a preliminary injunction forbidding defendants from interfering with the entry of aliens solely on the ground that the aliens are, or are believed to be, homosexual. The court found that the merits raised sufficiently serious questions to make them a fair ground for litigation and that the balance of hardships tipped decidedly in favor of the Committee and its officers. *See Aguirre v. Chula Vista Sanitary Service,* 542 F.2d 779, 781 (9th Cir.1976) (discussing grounds for granting a preliminary injunction). The court held that a serious question was presented concerning whether homosexuality is still considered a mental disease, disorder, or psychopathic personality trait. Weighing the hardships, the court found that significant first amendment rights of the Committee and its officers were at stake, whereas the INS asserted no harm to it or to the public from an injunction and showed no legitimate government interest in maintaining the challenged policy. The district court subsequently granted summary judgment in favor of the Committee and its officers on their claim for a permanent injunction and declaratory relief, holding the INS' policy of *per se* exclusion of homosexual aliens invalid as contrary to congressional intent and violative of plaintiffs' first amendment rights. *Lesbian/Gay Freedom Day Committee, Inc. v. United States Immigration and Naturalization Service,* 541 F.Supp. 569 (N.D.Cal.1982). The government appeals.

**B. DISCUSSION**

The Committee and its officers contend that the government's policies excluding homosexual aliens impinge on their rights as American citizens to communicate and associate with such aliens. Because of our holding in the *Hill* case, we do not reach this contention. *City of Los Angeles v. Lyons,* —— U.S. ——, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983).

Because the PHS refuses to issue medical certificates on the basis of homosexuality *per se* and because we today hold that the INS may not exclude homosexual aliens without such certificates, it is completely speculative that any aliens will be excluded in the future on the basis of their homosexuality *per se.* Federal courts may not issue injunctions on such conjecture. *Lyons,* at ——, 103 S.Ct. at 1671.

The judgment in appeal no. 82–4366 is AFFIRMED. The judgment in appeal no. 82–4423 is VACATED.[13]

---

12. In their complaint, plaintiffs also sought relief against violations of their rights to equal protection and to privacy. These claims were abandoned in the district court, *Lesbian/Gay Freedom Day Committee, Inc. v. United States Immigration and Naturalization Service,* 541

F.Supp. 569, 580 n. 6 (N.D.Cal.1982), and were not discussed in the plaintiffs' brief on appeal.

13. Although the parties did not raise the issue of justiciability in their briefs, the court has a duty to consider it *sua sponte. See Canez v. Guerrero,* 707 F.2d 443 at 446 (9th Cir.1983).